## Commonwealth, ex rel., the Attorney-General, Appellant, *v.* Fitler, Mayor, et al.

*Visiting physicians of Philadelphia hospital—Competitive examination.*

Visiting physicians of the Philadelphia hospital are "professional experts" within the meaning of the act of June 1, 1885, art. XII, § 3. They may, therefore, be legally appointed without competitive examination.

It is the duty of the board of directors of the Department of Charities and Correction of the City of Philadelphia to elect the medical staff of the Philadelphia hospital annually, by the vote of the majority of the members of the board.

Argued Jan. 11, 1892. Appeal, No. 305, Jan. T., 1891, by Commonwealth, from judgment of C. P. No. 1, Phila. Co., March T., 1890, No. 882, overruling demurrers to writ of mandamus and to the return of the writ. Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, McCOLLUM, MITCHELL and HEYDRICK, JJ.

Upon information from the attorney-general, an alternative writ of mandamus was issued directed to the Mayor and Heads of Departments of the city of Philadelphia as a Civil Service Board and to the members of the Board of Charities and Correction, commanding the Civil Service Board to show cause why they should not make and promulgate rules and regulations touching the medical service at the Philadelphia Hospital, in accordance with the requirements of the act June 1, 1885, and commanding the Board of Charities and Correction to show cause why, immediately upon the making and promulgation of such rules and regulations, they should not appoint physicians of the Philadelphia Hospital in pursuance thereof.

The return filed on behalf of all the respondents set forth that the visiting physicians of the Philadelphia Hospital were professional experts and not employees, officers, or subordinate

officials, and that therefore they were exempt from the operation of the Civil Service features of the Bullitt Bill requiring systematic, open, and competitive examination as a prerequisite to appointment.

The relator demurred to this return.

Richard C. McMurtrie, Esq., a member of the Board of Charities and Correction, filed an individual demurrer to the alternative writ, averring that the appointment of the physicians lay wholly with the president of the board, and that he was therefore improperly joined as a respondent.

Both demurrers were overruled, and judgment was entered for the respondents, ALLISON, J., filing the following opinion.

" Two questions of law are presented by the pleadings for the decision of the court :—

" First.—Are the visiting physicians of the Philadelphia Hospital professional experts, in the sense in which the term is used, to express the intent of the legislature in section 3 of article XII. of the act of June 1, 1885 ?

" Second.—Is the power of selecting or appointing members of the medical staff, composed of the visiting physicians of the hospital, vested in the president and four directors, constituting the Board of Charities and Correction, or is such power to be exercised by the president alone, who is constituted and declared to be the head of the department?

" The first question is raised by the demurrer of the Commonwealth to the return to the alternative writ of mandamus, and the second is presented by the demurrer to the information and alternative writ filed by Richard C. McMurtrie on his own behalf, he being one of the four directors of the Department of Charities and Correction.

" The information and alternative writ make complaint that the act of June 1, 1885, entitled ' An act to provide for the better government of cities of the first class,' has been violated by the mayor and heads of departments by their neglect or refusal to provide by rule, for open and competitive examination of members of the medical staff for election or appointment as visiting physicians of the Philadelphia Hospital. The rule of July 2, 1889, under which the medical staff or board of visiting physicians are now elected, provides for such elec-

tions annually by the vote of a majority of the members of the Board of Charities and Correction.

" The complaint on the part of the Commonwealth is, that the law is violated by the election of the staff for one year, instead of for or during good behavior, and that such selection or appointment is not based on superior fitness for the several positions on the staff, ascertained by competitive examination.

" The answer to this complaint, as it appears in the return to the alternative writ, is, that the members of the medical staff who comprise the board of visiting physicians of the hospital are not required to submit to such examination, because they are neither officers, clerks, or employees of the city, nor do they fall within the designation subordinate officers, or subordinate officials, as such terms are used in the second and twelfth articles of the act.

" The return further sets up, that the physicians who constitute the medical staff, not being officers, clerks, or employees, subordinate officers, are ' professional experts,' within the true intent and meaning of the law, which excepts persons who serve the city in that capacity from the necessity of submitting to examination as a prerequisite to their election or appointment.

" To this return the relator has demurred, which raises the single question on the issue joined by the Commonwealth, are or not visiting physicians of the Philadelphia Hospital ' professional experts,' within the meaning of the *Bullitt Bill* ?

" The radical changes in the policy of the city government sought to be introduced by the act of 1885 were appointments based on qualifications for office, which qualifications are to be ascertained by systematic and open examinations ; appointments to, promotions, and removals from office not to be made for political reasons, and tenure of office or employment to last during good behavior.

" These principles, however, are not intended to be of universal application. Article XII., which provides a system of competitive examination, excepts assistants of the city solicitor, assistants or laborers appointed for special or temporary purposes, professional experts, and such others as are specially excepted by this act.

" The question now under consideration turns chiefly on the

ascertainment of the proper meaning of the words professional experts, as they stand in the law of 1885.

" The contention of the relator, as stated in his brief of argument, is, that the word expert is not intended to be used with relation to specific or professional knowledge and skill alone, but to these qualities brought into use for special cases and temporary purposes. But if this is a correct interpretation of the portion of the law which exempts from examination the several classes of persons therein named, the result is reached by ignoring the most important and qualifying word in relation to experts not subject to the Civil Service examination. And in so doing the rule is violated, that it is always unsafe to depart from the plain and literal meaning of words contained in a statute, out of deference to some supposed intent, or absence of intent, which would prevent the application of the words actually used to a given subject. In the case of the City of Pittsburgh v. Kalchthaler, 114 Pa. 552, this is characterized as walking in a devious and dangerous path, a practice, the court say, which ought to be avoided and not followed.

" The meaning thus sought to be placed on the words professional experts, shifts the intention of the lawmakers as expressed in the act, from the designation of the kind or quality of the expert, to the kind of service which a professional expert may perform when employed by the city in a special case.

" If this is the true interpretation of the act, it is quite evident that the expression of such intention has been wholly omitted by the legislature, and therefore is not to be adopted, unless the intention to attach such meaning to the words under consideration cannot be avoided.

" It is not every one who may justly be entitled to call himself an expert, who can lay proper claim to the title or designation of professional expert, and it is not experts merely, but professional experts, who are not required to submit themselves to competitive examination should they make application to be elected or appointed to positions requiring professional expert qualifications.

" The contention of the relator is, that real estate experts, builders, machinists, and bookkeepers are to be included as falling within the legislative meaning of the words professional

experts, as they are found in the act, along with physicians, lawyers, chemists, and engineers, when their attainments or expert qualifications are made use of by the city for special cases and for temporary purposes.

"In most of the instances cited, the use to be made of such experts is founded on the fact that such persons are generally called upon to give their special or expert testimony in the trial of causes in which the city is a litigant, but in such cases they are brought into court to aid the city by the Commonwealth's process of subpœna, and stand as witnesses before the law, and not as experts employed by the city.

"That this portion of the act refers to expert services which are special and temporary only, cannot, we think, be successfully maintained, for there is a sense in which the word professional is generally used to distinguish classes of professional persons from those who are engaged in the various occupations of business or trade.

"We speak of the professions of medicine, law, and divinity, as the learned professions, and also of the profession of arms; so, also, the term has come to be applied to other occupations or callings, all of which require learned and special preparation in the acquirement of scientific knowledge and skill, necessary to a proper understanding of and successful management of such occupations. As an illustration of this remark, it is not unusual now to regard the occupation of a civil or mining engineer, or of an electrician, as a professional occupation, because scientific learning and knowledge is essential to a proper understanding of such a calling. But we do not speak of or understand the business of a merchant, or a blacksmith, or a carpenter, or tailor, as falling properly within the designation of professional occupations, or of those who achieve success beyond their fellows in such callings, as professional men, or as professional experts. They may become experts, but not professional experts.

"The contention of the relator under this head of discussion, in our opinion, is not supported by the letter or the spirit of the law. Not only have we not found anything in the wording of the act which justifies the meaning sought to be extracted from it, but we think the contrary intention may fairly be inferred from the connection in which the words profes-

sional experts stand in the section under consideration, and the object which the legislature was seeking to secure in the enactment of the Bullitt Bill. The excepted classes of persons named in the act are assistants of the city solicitor, assistants, or laborers employed for special or temporary purposes, and professional experts, and such others as are specially excepted by the act. The words professional experts, and such others specially excepted, have no connection with the clause which they follow ; they are in the disjunctive. Assistants or laborers employed for special temporary purposes are a class by themselves; professional experts constitute another distinct class, and " all others, specially excepted by the act," make up a class separate and apart from the other two.

" If the employment, therefore, of experts, be restricted to special cases, as the relator contends, it logically and naturally follows that the several persons who are called in to perform such service belong to the class designated assistants, whose services are to be only temporary, and not to the class designated professional experts, whose duty, under the law, is without limitation or qualification of any kind.

" To what then, and to whom, does the designation professional experts apply ? When the act was passed, the administration and conduct of the Medical Department of the Philadelphia Hospital was substantially the same as it is now. It was divided between the resident and visiting physicians ; the latter organization being also known as the medical staff of the hospital. The body known as resident physicians consisted of a chief resident physician and a number of subordinate assistants ; the assistants were largely composed of recent graduates of medicine, who resided in the hospital, and were compensated for the service which they rendered by the opportunity which such service afforded for acquiring a practical knowledge of their profession.

" Of these opportunities, Dr. D. Hayes Agnew, in the opening clinical lecture at the hospital, in 1862, said : ' One year of such service will yield a greater medical experience than ten years of an ordinary city or country practice.'

" The medical staff or board of visiting physicians, was composed of physicians and surgeons, many of whom were known and recognized in the community and by the profession as

specialists, or experts in the various departments of medical science, who resided at their several homes, performed their duties as visiting physicians, without pecuniary compensation; were divided into classes as specialists, whose duties consisted in visiting the patients at regular intervals, prescribing the proper remedies, and exercising, under established rules, a general medical supervision of their several departments of service.

" This was the condition of the medical service at the hospital when the Bullitt Bill was drafted and when it was enacted into a law.

" The inference is, therefore, a legitimate one, that when the Department of Charities and Correction was organized, the then existing condition of the hospital administration, including the medical staff, the class of medical practitioners of whom it was composed, the conditions, as well as the nature and amount of gratuitous service performed, entered into the considerations which influenced the creation of the department, under whose care the hospital was placed.

" There is no intention expressed to change the administration of the hospital in either of its branches of duty. The care of the poor who required medical treatment, and those who did not, were placed in the hands of the Board of Charities and Correction, without direction to depart from or varying the administration of the affairs of the almshouse in any respect. The general purpose set forth in the tenth article is, to commit to the care and management of the president and four directors, who compose the governing board, the almshouse and other charitable institutions entrusted to the city, with the exception of the lazaretto or hospital, and institutions under the care of the Board of City Trusts.

" To the Councils, however, power is given to provide by general ordinance for all things needful for the proper and efficient management of said institutions not inconsistent with the provisions of the act.

" When we make further search for the true legislative intent as it bears on the present inquiry, we find that the twelfth article provides for the appointment of officers, clerks, and employees of the several departments by rules providing for the ascertainment of the fitness of applicants for appointment or

promotion to office, and that the legislature excepted from the operation of such rules professional experts, we are led to the conclusion that the intention was to protect the medical staff from the necessity of becoming applicants for appointment, which would subject them to examinations like those prescribed for officers, clerks and employees.

" That this is a reasonable inference becomes apparent, when the fact is recalled, that the medical staff was the only association or body of professional experts, who, at that time, or at any other time, so far as has been brought to our attention, rendered professional expert service to the city.

" Members of the medical staff did not then, and do not now, obtain their appointment through applications for election or appointment. They were then and are now selected on the basis of their special professional fitness, and are substantially invited or requested to take positions on the staff and render service to those suffering from disease or accident, and who are unable, by reason of their poverty, to procure proper treatment for themselves. The compensation of the members of the staff consisted in the consciousness of duty performed to the public, to the sick and the afflicted, and the increase in professional and expert knowledge and skill which is thus acquired.

" Rule 28 is appended to and made part of the return to the alternative writ. The second section shows upon what consideration the members of the medical board receive their appointment, and that the election to the staff is because of the qualification of its members as professional medical experts. It provides that the medical board of the Philadelphia Hospital shall consist of a medical, a surgical, and an obstetrical staff, not exceeding eight members each; also a neurological staff of four members, two ophthalmologists, two dermatologists, two laryngologists, a pathologist, and a bacteriologist.

" The appointment and classification of the thirty-six members of the medical board is founded on their several professional attainments, and as a like condition of organization and division of duties existed substantially before and at the time of the passage of the Bullitt Bill, it is, we think, abundantly clear to what the legislature referred when they made professional experts as a class by themselves, free from the requirements regulating competitive examination of applicants for office.

" The proper regulation of the medical administration of the hospital was every way worthy of legislative care and protection.   The medical history of the almshouse, afterwards designated the Philadelphia Hospital, justifies this conclusion, covering, as it does, a period of over one hundred and fifty years.   It is the oldest hospital on the continent, and had an existence twenty years before a medical school was founded in this city.

" Doctor Agnew, in the lecture before referred to, says: That, under an improved condition in its affairs, which began when political considerations ceased to control the appointment of members of the Board of Guardians of the Poor, it regained its former prestige, which it had in some degree lost, and it now ranks as not only the first clinical school in the land, but the claim is made for it, that it is the largest school of clinical instruction to be found anywhere. .

" When we take into account the fact that one prominent feature of medical instruction and treatment of disease in this hospital has been for so many years to a great extent carried on through the instrumentality of a medical board of visiting physicians, men who were eminent in the profession of medicine, the importance of protecting this feature of the administration of the hospital is most apparent.   When a change was proposed in the control and government of the almshouse, what was more reasonable and proper than the protection of this useful and efficient arm of the medical service of the hospital by exempting the staff from competitive examination in the several specialties of medical knowledge in which they had attained the most advanced rank.   And this, we think, has been accomplished by the insertion in the act of the two words on which this controversy so greatly hinges.

" Accepting this conclusion, it follows that the members of the medical staff are neither officers, subordinate officials, or employees of the city, nor of the department under whose government the hospital is placed, which renders unnecessary the further consideration of the views, so earnestly pressed upon the attention of the court by counsel sustaining the contention of the Commonwealth.   It may, however, be well to add to what we have said, a few words upon the prominent points discussed on the part of the Commonwealth in support of its ap-

plication.  If the members of the medical board or hospital staff are to be regarded as professional experts, and therefore not subject to examination, the requirement to perform some degree of executive or administrative duty does not alter their standing as professional experts.  If exempt under the law of 1885, a rule adopted by the mayor and heads of departments does not transform the professional expert into an officer.  We also hold that, under no view which can be taken of this question, can the members of the staff be regarded as employees of the city.  An employee of a municipality means a person who is employed as an agent or servant of the local government, who, by contract, express or implied, is to be paid for whatever service he may perform.

"It could not have been intended that professional medical experts, who render charitable aid to the suffering poor under the care of the city, without fee or reward, should be regarded as occupying the position of employees.

"In relator's brief of argument it is claimed that one feature of article XII., section 3, is overwhelmingly against the view entertained by the respondents.  Fair casuistry, it is claimed, cannot distinguish between the assistants of the city solicitor and the medical board of the Philadelphia Hospital, in respect to their being or not being professional experts.

"But this overlooks the fact that the assistants of the city solicitor are not made up of professional gentlemen alone; his assistants embrace laymen as well as lawyers, and this assertion of the relator also assumes that the professional members of his official family claim to be, and that they have attained, the rank of professional experts.

"The inference, therefore, is, that it was necessary to exempt the assistants of the city solicitor eo nomine as a class by themselves, because they are not all professional men, and therefore all cannot be professional experts.

"The solicitor is assisted by clerks and agents who are not lawyers, much less legal experts ; it would therefore have been impossible to exempt his assistants as a class or body of persons under the general term of professional experts.

"The chief law officer of the city is responsible for the proper discharge of the duties of his office, which can only be performed by assistants or aids between whom and himself rela-

tions of confidence and trust must be maintained. It was doubtless thought necessary, for this reason, that no one should be imposed on him as an assistant on the ground that he had passed the requisite examination before an examining board. This might result in imposing on the solicitor persons who were distasteful to or even inimical to him, which would greatly embarrass the head of the department in the conduct and administration of his office.

" For the reasons stated, all the assistants of the solicitor, whether lawyers or laymen, were by general, official, rather than professional, designation, relieved from the operation of civil service rules.

" The question presented by the demurrer of Mr. McMurtie requires but brief consideration.

" By the tenth article of the act, the Department of Charities and Correction is placed under the charge of a president and four directors, of which department the president is declared to be the head. The article says, the board shall appoint all officers and servants of the institutions under its management.

" The twelfth article, section 2, declares, that the directors or chief officers of departments shall appoint all subordinate officers and clerks. The third section reads : " All officers, clerks, and employees . . . . in the several departments . . . . shall be appointed by the head of the said department.

" Upon the well-recognized rule of construction of statutes, that when in its several parts there is found to exist contradiction in statement and requirement that cannot be reconciled, the last in order will prevail over the first, for the reason that the legislature is supposed to have set forth in its last statement in the act its final decision on the subject to which the legislation refers.

" The application of this principle would require that this demurrer should be sustained, if the members of the medical staff were either officers, clerks, or employees of the department.

" Our conclusion, just stated, is, that they are not, but that they are appointees distinct from officers, clerks, and employees ; that, as professional experts, they stand apart and by themselves, and are therefore not to be appointed by the head of the department under the requirement of the third section of article XII. Nor is their appointment, in terms, directed by any express requirement of the tenth article.

" But, under the general power of ' care, management, administration, and supervision ' of the almshouse, given to the board, there is, we think, ample authority to provide for the election of the staff, independent of the rule established by the mayor and heads of department of July 2, 1889, but that under that rule which we hold the mayor and heads of department had power to make, it is the duty of the board to elect the hospital staff annually, as therein provided, by the vote of the majority of the members of the board.

" For the reasons stated we overrule the demurrer of the Commonwealth, and also the demurrer of Richard C. McMurtrie, and enter judgment thereon for the respondents."

*Errors assigned* were (1) in deciding that the visiting physicians of the Philadelphia Hospital are " professional experts " in the sense in which that term is used in section 3 of article XII. of the act June 1, 1885 ; (2) in deciding that the mayor and the heads of departments of the city of Philadelphia were authorized by the said act of the general assembly of the Commonwealth of Pennsylvania, approved June 1, 1885, to make and enforce the following rule and regulation, to wit : " These rules shall not apply to the medical staff of the Philadelphia Hospital, which shall be appointed annually by the vote of a majority of the members of the Board of Charities and Correction, and vacancies on said staff may be filled by a similar vote of any unexpired term at any stated meeting of the said board ;" (3) in deciding that the visiting physicians of the Philadelphia Hospital are not subordinate officials of the city of Philadelphia; (4) in deciding that the visiting physicians of the Philadelphia Hospital do not, under the terms of the said act of the general assembly of the Commonwealth of Pennsylvania, approved June 1, 1885, hold their offices for the tenure of good behavior; (5) in not issuing a writ of peremptory mandamus against the respondents in the terms prayed for in the information ; (6) in overruling the demurrer of the Commonwealth ; (7) in entering judgment for the respondents.

*C. Stuart Patterson, W. U. Hensel,* attorney general, *Wm. Herbert Washington* and *John G. Johnson* with him, for appellant.

*Charles B. McMichael, Charles F. Warwick* with him, for appellees.

PER CURIAM, January 25, 1892.

This case presents an interesting question, but it is discussed so satisfactorily by the learned judge of the court below that nothing remains to be added. We adopt his opinion, and affirm the judgment for the reasons given by him.