G. F. WRIGHT, FRED E. HARVEY AND STANLEY WRIGHT, COPARTNERS PRACTICING THEIR PROFESSION UNDER THE FIRM NAME AND STYLE OF WRIGHT, HARVEY & WRIGHT, *v.* WILLIAM BORTHWICK, TAX COMMISSIONER OF THE TERRITORY OF HAWAII.

No. 2285.

H. A. R. AUSTIN *v.* WILLIAM BORTHWICK, TAX COMMISSIONER OF THE TERRITORY OF HAWAII.

No. 2286.

C. W. DICKEY *v.* WILLIAM BORTHWICK, TAX COMMISSIONER OF THE TERRITORY OF HAWAII.

No. 2287.

HUGH C. TENNANT, EDWARD J. GREANEY AND SAM WALLACE, COPARTNERS PRACTICING THEIR PROFESSION UNDER THE FIRM NAME AND STYLE OF TENNANT, GREANEY & WALLACE, *v.* WILLIAM BORTHWICK, TAX COMMISSIONER OF THE TERRITORY OF HAWAII.

No. 2288.

FOREST M. BRANCH *v.* WILLIAM BORTHWICK, TAX COMMISSIONER OF THE TERRITORY OF HAWAII.

No. 2289.

FILED MAY 25, 1937.                    DECIDED JULY 26, 1937.

COKE, C. J., BANKS AND PETERS, JJ.

OPINION OF THE COURT BY COKE, C. J.

In 1935 the territorial legislature enacted a general excise tax law which levied a privilege tax of one and one-quarter per cent of gross income against persons, firms and corporations derived from businesses or activities carried on within the Territory for gain or economic benefit. Included within the scope of the Act were retailers, whole-salers, producers, contractors, theaters, amusement parks, radio broadcasting stations, printers and publishers, etc. (See Act 141, L. 1935.) By section 2-1-G of the Act all persons engaged in the practice of a profession were placed on a rate of one-half of one per cent. This section reads: "Professions. Upon every person engaging or continuing within

this Territory in the practice of a profession, including those expounding the religious doctrines of any church, there is likewise hereby levied and shall be assessed and collected a tax equal to one-half of one per cent (½%) of the gross income of such practice or exposition."

The defendant-appellant, William Borthwick, is the tax commissioner of the Territory of Hawaii. The plaintiffs-appellees claimed to be professional men practicing their respective professions within the Territory of Hawaii and as such are subject to the lower rate of tax prescribed in section 2-1-G computed upon their respective gross incomes. The tax commissioner held that they were not engaged in the practice of any profession and therefore were subject to the higher tax of one and one-quarter per cent. The appellees paid the higher tax demanded by the commissioner under protest and these several actions were brought by appellees against the tax commissioner pursuant to section 571, R. L. 1935, for recovering the amounts in controversy. The judge of the circuit court decided the controversies in favor of the taxpayers and gave judgment for the return of the amounts involved and also reimbursement of costs paid by appellees. The commissioner has brought the cases to this court by exceptions. Because the questions involved in all cases are similar the parties have stipulated that the five appeals may be consolidated for hearing in this court. We shall treat them accordingly.

In case 2285 the plaintiff-appellee, Wright, Harvey & Wright, are surveyors; in case 2286 H. A. R. Austin is a civil engineer; in case 2287 C. W. Dickey is an architect; in case 2288 Tennant, Greaney & Wallace are certified public accountants; and in case 2289 Forest M. Branch is a practicing dentist. All of these parties have their places of business in Honolulu. Appellant's bill of exceptions is unnecessarily voluminous. It is sixty-four pages in length and contains seventeen separate exceptions to the rulings

and decision of the trial court. Reduced to final analysis these appeals present but two questions, both being matters of statutory construction. That is, were the appellees at the taxation date engaged in the practice of professions as contemplated by section 2-1-G of Act 141 and if that question be resolved in favor of the taxpayers was the circuit judge authorized, under section 3795, R. L. 1935, to direct the refund to the appellees of their respective cost deposits.

When the legislation was first proposed no distinction was drawn between professionals and nonprofessionals. They were all placed upon the rate of one and one-quarter per cent. For reasons which do not appear and with which we are not concerned the proposed Act was amended so that those engaged in professions were required to contribute a tax of one-half of one per cent. The main question presented by the tax commissioner's appeals turns upon the definition of the word "profession." If, as urged by him, we adopt its ancient restricted meaning it includes merely members of the three "learned professions," namely, law, medicine and divinity. If, on the other hand, we are to conclude that the processes of evolution have rendered that definition obsolete we will then ascribe to the word a present-day meaning which is far broader and more comprehensive than was accorded to it centuries ago. "Profession" is defined by Webster as "The occupation, if not purely commercial, mechanical, agricultural, or the like, to which one devotes oneself; a calling in which one professes to have acquired some special knowledge used by way either of instructing, guiding, or advising others or of serving them in some art; as, the *profession* of arms, of teaching, of chemist. *The three professions, or learned professions, is* a name often used for the professions of theology, law, and medicine. Broadly, one's principal calling, vocation, or employment." Webster's New International Dictionary (1935), p. 1976.

We are not prepared nor are we called upon to say just where the line of demarcation between profession and nonprofession is to be drawn. It is undoubtedly true that many persons holding licenses to ply their vocations are not practicing professions. Pawnbrokers, although required to possess licenses, are not professionals and neither are chauffeurs, vendors of merchandise nor many others similarly engaged.

But the early-day idea that the meaning of the word "profession" was restricted to include merely those belonging to the professions of law, medicine and divinity has been gradually discarded by the courts and lexicographers, the modern tendency being to enlarge and extend the scope and meaning of the term. *United States* v. *Laws,* 163 U. S. 258, involved the status of a foreigner coming to this country under a contract as a chemist. The question was whether his entry was violative of an Act of Congress passed February 26, 1885 (Ch. 164, 23 Stat. 332), or whether he belonged to a professional class and thus came within one of the exceptions named in the statute. The supreme court in passing upon the question said: "Now by its very terms it is not intended to apply to any person belonging to any recognized profession. We think a chemist would be included in that class. Although the study of chemistry is the study of a science, yet a chemist who occupies himself in the practical use of his knowledge of chemistry as his services may be demanded may certainly at this time be fairly regarded as in the practice of a profession. One definition of a profession is an 'employment, especially an employment requiring a learned education, as those of divinity, law and physic.' (Worcester's Dictionary, title profession.) In the Century Dictionary the definition of the word 'profession' is given, among others, as 'A vocation in which a professed knowledge of some department of science or learning is used by its practical application to the

affairs of others, either in advising, guiding, or teaching them, or in serving their interests or welfare in the practice of an art founded on it. Formerly, theology, law, and medicine were specifically known as *the professions;* but as the applications of science and learning are extended to other departments of affairs, other vocations also receive the name. The word implies professed attainments in special knowledge as distinguished from mere skill. A practical dealing with affairs as distinguished from mere study or investigation; and an application of such knowledge to uses for others as a vocation, as distinguished from its pursuit for its own purposes.' There are professors of chemistry in all the chief colleges of the country. It is a science the knowledge of which is to be acquired only after patient study and application. The chemist who places his knowledge acquired from a study of the science to the use of others as he may be employed by them, and as a vocation for the purpose of his own maintenance, must certainly be regarded as one engaged in the practice of a profession which is generally recognized in this country.

"The question presented to us assumes that the individual is a chemist, and that he has come to this country for the purpose of pursuing his vocation as a chemist on a sugar plantation in Louisiana. It may be assumed that the branch of chemistry which he will practice will be that which relates to and is connected with the proper manufacture of sugar from the sugar cane, or possibly from sorghum or beets. He is none the less a chemist, and none the less occupied in the practice of his profession because he thus limits himself to that particular branch, which is to be applied in the course of the scientific manufacture of sugar any more than a lawyer would cease to practice his profession by limiting himself to any particular branch thereof or a doctor by confining his practice to some speciality which he particularly favored and was eminent in.

"It is not stated what the particular duties of a chemist on a sugar plantation are, but it is quite plain, even to one not engaged in the business, that there would be a necessity for the services of one skilled in the science of chemistry in order to enable a manufacturer to make the most out of his materials and produce a commodity up to the proper standard and of a marketable nature. All sugar cane, for example, is not alike in quality or in the proportions of the ingredients which enter into its composition, and in the course of manufacture these differences must be discovered and determined, and the material must be treated accordingly so that the finished product shall be a commodity which is up to the standard set with reference to the particular grade of sugar which it is claimed to be. In order to determine this difference and to reach this standard, analyses of the different samples of the cane at some period of the process of manufacture ought to and must be made, and these analyses it is the province of a chemist to make. Upon their results depend the future treatment of the article. The samples analyzed will of course differ, to some extent, in their qualities from each other, and each will require different treatment, depending upon the result of the analysis and the directions of the chemist founded thereon. There can be, therefore, no regular or formal rule or method adopted for all cases. It becomes necessary to examine each sample and decide after such examination what treatment is necessary for that particular lot thus examined. Learning in the science, skill in its practice, experience in results, are all factors going to make up the competent chemist in this particular branch.

"The fact that the individual in question, by this contract, had agreed to sell his time, labor and skill to one employer and in one prescribed branch of the science, does not in the least militate against his being a professional chemist nor does it operate as a bar to the claim that while so

employed he is nevertheless practising a recognized profession. It is not necessary that he should offer his services to the public at large nor that he should hold himself ready to apply his scientific knowledge and skill to the business of all persons who applied for them before he would be entitled to claim that he belonged to and was actually practising a recognized profession. As well might it be said that the lawyer who enters into the service of a corporation and limits his practice to cases in which the corporation is interested thereby ceases to belong to the profession. The chemist may confine his services to one employer so long as the services which he performs are of a professional nature. It is not the fact that the chemist keeps his services open for employment by the public generally which is the criterion by which to determine whether or not he still belongs to or is practising a recognized profession. So long as he is engaged in the practical application of his knowledge of the science, as a vocation, it is not important whether he holds himself out as ready to make that application in behalf of all persons who desire it, or that he contracts to do it for some particular employer and at some named place.

"We have no doubt that the individual named comes within one of the exceptions named in the statute."

The subject had the attention of the supreme court of Pennsylvania in 1892 in *Commonwealth* v. *Fitler,* 23 Atl. 568, the court saying: "We speak of the professions of medicine, law, and divinity as the learned professions, and also of the profession of arms; so, also the term has come to be applied to other occupations or callings, all of which require learned and special preparation in the acquirement of scientific knowledge and skill, necessary to a proper understanding of and successful management of such occupations. As an illustration of this remark, it is not unusual now to regard the occupation of a civil or mining engineer,

or of an electrician, as a professional occupation, because scientific learning and knowledge is essential to a proper understanding of such a calling. But we do not speak of or understand the business of a merchant or a blacksmith or a carpenter or tailor as falling properly within the designation of professional occupations, or of those who achieve success beyond their fellows in such callings as professional men, or as professional experts. They may become experts, but not professional experts." (See also *Geise* v. *Pennsylvania Fire Ins. Co.,* 107 S. W. 555.)

The courts of England have employed similar reasoning. See *Commissioners of Inland Revenue* v. *Maxse,* 1 K. B. (1919) 647, where the court said: "The line of demarcation may vary from time to time. The word 'profession' used to be confined to the three learned professions, the Church, Medicine and Law. It has now, I think, a wider meaning. It appears to me clear that a journalist whose contributions have any literary form, as distinguished from a reporter, exercises a 'profession'; and that the editor of a periodical comes in the same category." It is therefore apparent that the courts as well as the lexicographers, keeping pace with the march of time, have recognized that the noun "profession" is not a static or rigid term. Its meaning has varied in the past and will undoubtedly vary in the future. It will continue to become more comprehensive, as science, learning and skill are broadened and extended.

We are requested by the commissioner to invoke the rule of strict construction of the statute against the taxpayers. Section 10, R. L. 1935, requires that "The words of a law are generally to be understood in their most known and usual signification." We believe that the meaning of the word "profession" should be determined by this reasonable canon of construction. It is the intention of the legislature which we are endeavoring to ascertain and to

do so the words of the statute under consideration are to be taken in their commonly recognized and accepted sense. (See *United States* v. *Buffalo Gas Fuel Co.*, 172 U. S. 339.) The Latin maxims *noscitur a sociis* and *expressio unius est exclusio alterius* which appellant seeks to invoke are inapplicable and do not aid in solving the question before us. True, those expounding the religious doctrines of any church are specifically included in the favored class but this inclusion was not intended as exclusive of others of the professional class. Indeed counsel for the commissioner concede that practitioners of law and of medicine should also be included.

From the foregoing we conclude that the several appellees are all engaged in callings which require a high degree of specialized education, training, knowledge and skill and they therefore fall within the modern-day and accepted designation of professional men and each of them was, at the taxation period, engaged in the practice of a profession.

The final contention of the commissioner is that the court below committed error in ordering the clerk to reimburse appellees for the amount of the cost deposits made in the several cases. Section 3795, R. L. 1935, provides that "Neither the Territory nor any county or city and county nor any officer acting in his official capacity on behalf of the Territory or any county or city and county, shall be taxed costs or required to pay or make any deposit for the same or file any bond whatsoever in any case. In all cases in which a final judgment or decree is obtained against the Territory, county, city and county, or other political subdivision, any and all deposits for costs made by the prevailing party shall be returned to him, and he shall be reimbursed by the Territory, county, city and county, or other political subdivision, as the case may be, all actual disbursements, not including attorney's fees or commissions, made by him and approved by the court." The purpose of

the foregoing statute is to provide a means by which a person who prevails in a suit against the Territory, a county, a city and county, or any political subdivision, may have restitution of costs expended by him. In the present case the actions were instituted against Mr. Borthwick, as tax commissioner, in his official capacity representing the Territory. He is a mere symbol. The Territory is the actual party defendant. These proceedings, therefore, are in effect actions against the Territory appearing through the medium of the tax commissioner and under the statute the prevailing parties are entitled to have restored to them their costs.

We have carefully examined all of the numerous exceptions presented in appellant's bill and conclude that they are without merit.

The exceptions are overruled as to all of the above enumerated cases.

*W. B. Pittman,* Attorney General, *D. C. Lewis* and *J. Wiig,* Deputy Attorneys General, for the tax commissioner.

*Stanley, Vitousek, Pratt & Winn* for appellees.