Rev. James S. Preston, 4210 Powelton Avenue, Philadelphia, Penna. et al. v. The City of Philadelphia et al. Rev. James S. Preston et al., Appellants.

Argued April 6, 1976, before President Judge Bowman and Judges Crumlish, Jr., Kramer, Wilkinson, Jr., Mencer, Rogers and Blatt.

*Edward V. Sparer,* with him *Charles W. Bowser, H. Patrick Swygert, Bruce L. Thall,* and *R. Michael Kemler,* for appellants.

*John M. McNally, Jr.,* First Deputy City Solicitor, *Sheldon L. Albert,* City Solicitor, and *Stephen Arinson,* Chief Deputy City Solicitor, for appellees.

*Richard Kirschner,* with him *Miriam L. Gafni,* and *Markowitz & Kirschner,* for amici, APTA District Council 47, AFSCME, AFL-CIO, Local 488, District Council 33, AFSCME, AFL-CIO.

*A. L. Zwerdling,* with him *Janet Kohn* and *Zwerd-
ling, Maurer and Papp,* for American Federation of
State, County and Municipal Employees, AFL-CIO.

OPINION BY JUDGE ROGERS, August 12, 1976:

The appellants, Reverend James S. Preston, a Bap-
tist minister; Samuel Evans, Chairman of the Ameri-
can Foundation for Negro Affairs; Dr. Cynthia Cook,
a medical doctor at Philadelphia General Hospital
(PGH); Dr. Richard Freeman, a medical intern at
PGH; and Harriet Mayhugh and Jessie Powell, pa-
tients at PGH, filed a complaint in equity alleging
that the Mayor of the City of Philadelphia announced
the City's intention to close PGH and that such a clos-
ing would be illegal. The appellants were granted a
preliminary injunction and an evidentiary hearing was
set for five days later.

The complaint was not drawn in two counts. It
alleged only that there is a legal duty imposed upon
the city to continue in operation the PGH. At the
hearing the lower court sustained preliminary objec-
tions to that issue but stated that it would allow the
presentation of evidence on the issue of whether, by
closing the hospital, the city was capriciously avoid-
ing a duty to provide health care to indigent persons.
No evidence was presented by the appellants and the
court dismissed the complaint for failure to prosecute
on the alternative theory. This appeal followed; we
affirm.

The appellants insist that their complaint states a
cause of action, that there is a legal duty imposed up-
on the city to operate PGH as a functioning gen-
eral hospital available to indigent persons in Phila-
delphia.[1] They ground their case on three bases: that

---

[1] Similar issues were raised in *Boone v. Tate, Mayor of Phila-
delphia,* 4 Pa. Commonwealth Ct. 101, 286 A.2d 26 (1972), which

Pennsylvania statutory law and the Philadelphia Home Rule Charter require it; that the Mayor of Philadelphia has no power to terminate the operation of the hospital; and that the city cannot close the hospital without prior approval from the Pennsylvania Department of Health.

We have dutifully reviewed all of the law advanced by the appellants in support of their theories and, while there are strong indications of a desire to provide indigent health care, we fail to find therein any support for the proposition that the city has a duty to maintain PGH as such.

The appellants' statutory argument begins with prerevolution laws governing the Province of Pennsylvania and traces the history of PGH to modern times. In 1766, the General Assembly passed "An Act for the better employment, relief and support of the poor within the City of Philadelphia, the District of Southwark, the Township of Moyamensing and Passyunk and the Northern Liberties," making it lawful for persons within the province contributing ten pounds or more to a corporation named "Contributors to the Relief and Employment of the Poor in the City of Philadelphia" to become members of the corporation and elect managers of the fund thus created. The corporation was charged with the duty of erecting an almshouse in the city "to and for the reception and lodging of all such of the poor of the said city, district and township as shall be incapable of contributing towards their support by their labor." Act of February 8, 1766, 7 Statutes at Large of Pennsylvania 9. The corporation had the power to expend the money

_____

we decided on the grounds of mootness, and *Hoolick v. Retreat State Hospital*, 24 Pa. Commonwealth Ct. 218, 354 A.2d 609 (1976), where we found no constitutional or statutory duty upon the State to maintain a particular mental health care facility.

collected by the overseers of the poor which had been collected for the maintenance, support and employment of the poor.

"An Act for the Relief of the Poor," Act of March 9, 1771, 8 Statutes at Large of Pennsylvania 75, established the office of overseers of the poor with the power, *inter alia*, of levying and collecting taxes "for relieving such poor, old, blind, impotent and lame persons or other persons not able to work. . . ."[2]

With slight variations, the above Acts remained continuously in effect through 1782, when, after the Revolution, the Representatives of the Freeman of the Commonwealth of Pennsylvania in General Assembly reenacted the various poor laws previously adopted by the Proprietaries of the Province of Pennsylvania by and with the consent of the representatives of the freeman of the Province in General Assembly.[3]

The Acts were consolidated, amended and repealed by the Act of March 25, 1782, 10 Statutes at Large of Pennsylvania 401. That Act allowed the overseers of the poor, public appointees, to assume the duties of the private corporation (Contributors to the relief and employment of the poor in the City of Philadelphia) should the corporation fail to elect a board of directors

---

[2] This Act was to remain in effect for five years. The Act of April 6, 1776 reenacted it and declared it to be perpetual. The Act of March 24, 1778, revived it under the Commonwealth system after the Revolution. All of these acts were consolidated in the Act of March 29, 1803.

[3] We note that the General Assembly passed several similar bills to provide for houses for the employment and support of the poor in various other counties. Act of February 27, 1798 (Chester and Lancaster) ; Act of February 6, 1804 (York) ; Act of February 13, 1804 (Delaware) ; Act of March 10, 1806 (Montgomery) ; Act of March 28, 1806 (Dauphin) ; Act of March 11, 1807 (Franklin) ; Act of March 24, 1808 (Cumberland) ; Act of March 11, 1837 (Northampton). These Acts appear to have the same intent and purpose as the Acts with which we are dealing in the instant case.

or should the board fail to meet. The overseers of the poor became a corporation also, called "The Guardians of the Poor in the City of Philadelphia," with power and control over the almshouse.

The Act of March 29, 1803, 17 Statutes at Large of Pennsylvania 385, (passed by the now Senate and House of Representatives of the Commonwealth of Pennsylvania), made extensive revisions of the poor laws relating to the City of Philadelphia, the district of Southwark, and the township of Northern Liberties. A new corporate body was established, consisting of "substantial house-keepers" appointed by the municipalities, which was to supervise the almshouse and the house of employment of the poor and continue to exercise all the powers of the current managers of the almshouse, the Guardians of the Poor.[4]

This short statutory history preceded the Act of. March 5, 1828, 10 Smith's Laws 69, which created a new corporation called "The guardians for the relief and employment of the poor of the City of Philadelphia, the district of Southwark, and the townships of the Northern Liberties and Penn." All of the assets of the previous corporation were transferred to the new one, which had expanded geographical limits and membership on the board.[5] The Act of 1828 also authorized the guardians to sell the land upon which the almshouse was erected and to designate a "commission for the erection of buildings" which would be empowered to purchase another site for the building

---

[4] A difference between this corporation and the previous one was the geographical area encompassed by the Guardians. Previously they only encompassed the city. Under this Act they included certain surrounding municipalities. The duties, however, were essentially the same.

[5] The new corporation was authorized to hire what may have been the first professional social workers in the state, called visitors of the poor.

of a hospital, almshouse, house of employment and children's asylum "having due regard to the full and comfortable provision for all such poor persons as may require medical or surgical aid. . . ."[6]

The Act of February 2, 1854 extended the boundaries of the City of Philadelphia so as to include all of Philadelphia County. Sections 18 and 19 of that Act provided for the continuation of the office of guardian of the poor for the support of indigents in the city and the continuation of "houses of accommodation of the poor." Everything formerly owned, and all activities formerly engaged in, by the "Guardians for the relief and employment of the poor of the City of Philadelphia, the district of Southwark and the townships of Northern Liberties and Penn" were vested in the City of Philadelphia and the now elected guardians of the poor were charged with performing those duties.[7] The Act of June 1, 1885 abolished the office of the guardian of the poor and transferred its functions to the Department of Charities and Corrections. At the time of the passage of this Act there existed a municipal hospital for the prevention of contagious diseases which remained under the control of the Board of Health of the city, but the almshouse and general medical services for the poor were entrusted to the Department of Charities and Correc-

---

[6] Although this is the first mention of the provision of medical services to the poor, it appears that a major function the almshouse was to provide those services. Hence the argument, conceded by the appellees, that PGH is the lineal descendant of the almshouse.

[7] The Act of April 21, 1858, provides: "That no debt or contract hereafter incurred or made shall be binding upon the city of Philadelphia unless authorized by law or ordinance, and an appropriation sufficient to pay the same be previously made by council. . . ." See Mathews v. City of Philadelphia, 93 Pa. 147 (1880) (holding that suit on certain contracts entered into by the Board of Guardians of the Poor during the year 1877 could not be maintained when there were insufficient appropriations by the city).

tions. In *Commonwealth ex rel. the Attorney General v. Fitler,* 147 Pa. 288, 23 A. 568 (1892), the court, adopting the lower court's opinion, stated:

" 'The inference is, therefore, a legitimate one, that when the Department of Charities and Correction was organized, the then existing condition of the hospital administration, including the medical staff, the class of medical practitioners of whom it was composed, the conditions, as well as the nature and amount of gratuitous service performed, entered into the considerations which influenced the creation of the department, under whose care the hospital was placed.

" 'There is no intention expressed to change the administration of the hospital in either of its branches of duty. The care of the poor who required medical treatment, and those who did not, were placed in the hands of the Board of Charities and Correction, without direction to depart from or varying the administration of the affairs of the almshouse in any respect. The general purpose set forth in the tenth Article is, to commit to the care and management of the president and four directors, who compose the governing board, the almshouse and other charitable institutions entrusted to the city, with the exception of the lazaretto or hospital, and institutions under the care of the Board of City Trusts.' " 147 Pa. at 294, 23 A. at 570.[8]

The Act of April 8, 1903, created the Department of Public Health and Charities, abolished the Department of Charities and Corrections, and placed all hospitals belonging to the city under the new department. The Act of June 25, 1919, P.L. 581, *as amended,* 53 P.S. §12291 et seq., created the Department of Public

---

[8] The court's reference to the "lazaretto or hospital" concerns the municipal hospital, separate from PGH's predecessor, for the prevention and care of contagious diseases.

Health and entrusted it with the "care management, administration, and supervision of city activities relating to public health, including hospitals. . . ."

The Philadelphia Home Rule Charter, 351 Pa. Code, §1.1-100 et seq., adopted pursuant to the Act of April 21, 1949, P.L. 665, *as amended*, 53 P.S. §13101 et seq., continued the functions and duties of the Department of Public Health, created by the Act of 1919, in the Department of Public Health created under the Home Rule Charter, 351 Pa. Code §A-101. The Board of Trustees of Philadelphia General Hospital was placed within the Department of Public Health, 351 Pa. Code §3.3-101(f), and the Board of Trustees is given the direction and control of the management of the hospital, 351 Pa. Code §5.5-303, while the Department retains general supervisory powers, 351 Pa. Code §5.5-300(e).[9]

_____

[9] "5.5-300 Functions.

"The Department of Public Health shall have the power and its duty shall be to perform the following functions:

(a) *Protection of Public Health.* It shall administer and enforce statutes, ordinances and regulations relating to public health including those dealing with air, water, food and drugs, health hazards, the pursuit of occupations affecting the public health and pests, including animal, insect and plant-life.

(b) *Health Programs.* The Department shall institute and conduct programs of public health and medical research and programs to promote public education in all matters concerning public health.

(c) *Health Facilities.* The Department shall establish, maintain and operate health centers, stations and clinics, laboratories and other health facilities.

(d) *Vital Statistics.* The Department shall be the agency of the City for compiling, analyzing, maintaining and reporting statistics and data concerning births, still-births and deaths.

(e) *City Hospitals.* The Department shall have general supervision over all City hospitals now or hereafter owned or operated by the City. It shall determine the capacity of City hospitals and determine and designate the type of persons and the proportion of each to be received therein. The Department shall recommend and

The thrust of appellants' arguments is that the more than two hundred year history of statutes authorizing a hospital for the indigent in Philadelphia creates a duty upon the city to continue to maintain PGH. It is a novel argument for which we find no precedent. The statutes certainly express an intent to benefit the poor of the city, and by extended argument might be construed as imposing a duty upon the city to provide health care for the indigent,[10] but we can see no basis in the statutes or in the Home Rule Charter for the proposition that Philadelphia must maintain the PGH as such. Since the Board of Trustees and the city have the power to contract with universities for the provision of medical services at the hospital, *Robinson v. Philadelphia,* 400 Pa. 80, 161 A.2d 1 (1960), it would seem that, at the very least, the city would have the power to contract for the provision of those same services elsewhere.

The appellants next argue that, even if the city has no duty to maintain PGH, the mayor has no power to unilaterally terminate the operation of PGH. The argument that the mayor and the Board of Trustees of PGH have equal status is untenable. The mayor appoints members of the board, 351 Pa. Code §3.3-207, and they serve at the mayor's pleasure, 351 Pa. Code §3.3-404. It is a departmental board, 351 Pa. Code §3.3-903, subject to the general supervision of the Department of Public Health, 351 Pa. Code §5.5-300, *su-*

---

bring to the attention of the officers and boards of trustees of City hospitals standards and methods helpful in the government and administration of such hospitals and for the betterment of the condition of their patients."

[10] We make no determination on the issue of whether or not the city has such a duty. The lower court would have allowed testimony of this issue and it dismissed the case when appellants failed to present such testimony. The issue before us now simply goes to the city's duty to maintain PGH.

*pra* note 9, and the mayor has the specific power to disapprove any expenditure of money by the board, 351 Pa. Code §8.8-102.[11] Again we must note that the appellants failed to present any testimony regarding the reasonableness of the closing of PGH in relationship to the delivery of health care services in the city so that the lower court was unable to make a determination of whether the mayor abused his power by announcing the defunding of the board.

Finally, the appellants argue that the city must receive approval from the State before it can close PGH. The Pennsylvania Department of Health must approve or disapprove all plans for the erection or substantial alteration of any "supervised institution" receiving aid from the Commonwealth. Act of June 13, 1967, P.L. 31, 62 P.S. §202; Act of April 9, 1929, P.L. 177, *as amended,* 71 P.S. §604; Reorganization Plan No. 5 of 1973, effective July 1, 1973, 71 P.S. §755-5. The term "supervised institution" includes all hospitals maintained by any city, Act of June 13, 1967, P.L. 31, 62 P.S. §901, which would, of course, include PGH.

Once it is closed, PGH will no longer be a supervised institution, nor will it be receiving State aid. Appellants argue that the closing of PGH may mean

---

[11] "8.8-102 Estimates of Current Expenditures by Departments, Board and Commissions.

"In order to enable the Mayor to avoid deficits and to check on performance, each officer, department, board and commission of the City, or other agency receiving a City appropriation shall from time to time as requested by the Mayor prepare and submit to him through the Director of Finance for approval or disapproval an estimate of the amount of money required for each activity or function to be carried on by him or it during the ensuing month, quarter or such other period of the current fiscal year as the Mayor shall prescribe. If such estimate does not meet with the approval of the Mayor, it shall be revised in accordance with the Mayor's direction and resubmitted for approval; . . . ."

the loss of substantial State and Federal funds for the provisions of health care in the city. Be that as it may, we cannot hold that an institution receiving state assistance is thereafter precluded from closing its doors and foregoing future assistance.

The Order of the lower court is affirmed.