**In re ST. MARY HOSPITAL, Debtor.**

**NORRIS SQUARE CIVIC ASSOCIATION et al.,
Plaintiffs,**

v.

**ST. MARY HOSPITAL, et al.,
Defendants.**

**Bankruptcy No. 88–11421S.
Adv. No. 88–0565S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

May 9, 1988.

As Amended May 10, 1988.

Henry F. Siedzikowski, Daniel Carrigan, Jonathan Vipond, III, Baskin, Flaherty, Elliott & Mannino, P.C., Daniel E. Farmer, Harris B. Savin, Peter Rosenthal, Diamond, Polsky & Bauer, Philadelphia, Pa., for debtor.

Michael L. Molinaro, Katten, Muchin & Zavis, Chicago, Ill., Thomas E. Sweeney, Chadds Ford, Pa., Joseph T. Sebastianelli, Ernest L. Tsoules, Jr., Sebastianelli Law Associates, Paoli, Pa., for Franciscan Health Services.

James J. O'Connell, Kevin Callahan, Office of the Asst. U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

Stephen F. Gold, Henry Sommer, Richard P. Weishaupt, Louis S. Rulli, Community Legal Services, Inc., Philadelphia, Pa., for adversary plaintiffs.

Seymour Kurland, City Sol., Richard Gold, First Deputy City Sol., Cynthia E. White, Chief Asst. City Sol., Philadelphia, Pa., for City of Philadelphia.

Harold Berzow, Finkel, Goldstein & Berzow, New York City, for Hosp. Supply Co.

Virginia R. Powel, Asst. U.S. Atty., Philadelphia, Pa., for U.S., H.U.D. & H.H.S.

Howard T. Glassman, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for Nurses, Inc.

Byrna L. Singer, Cohen, Shapiro, Philadelphia, Pa., for Professional Health Care.

Gary M. Schildhorn, Mark J. Packel, Philadelphia, Pa., for Creditors' Committee.

Charles M. Golden, Philadelphia, Pa., for UMEDCO.

George Miller, Philadelphia, Pa., Examiner.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The most significant feature of bankruptcy jurisdiction is that it extends to all

or most issues relevant to a debtor and that it contemplates participation by any party having an interest in any issues relating to the debtor. The proliferation of issues which have arisen in the life of this case involving a Debtor-hospital since its birth on April 27, 1988, attest to the value of this feature. We have had a veritable forum of expression from the various parties interested in this matter: the Debtor; its parent entity, Franciscan Health Services, Inc. (hereinafter referred to as "FHS"); creditors, including a quickly-formed Creditors' Committee; and numerous community and political leaders concerned about the intention of the Debtor to close a facility which has provided the most important of human endeavors, help to those who need its vital services the most. Almost without exception, the many participating counsel have displayed vigorous and effective advocacy and yet have been respectful to the court and the points of view expressed by other parties.

We write this Opinion because we are prepared to take some fairly significant steps in this case. We wish to have the parties know the reasons for our action because the cooperation of all of them in the efforts that we suggest is important. Because we must act quickly, we write in the narrative; provide a minimal description of the procedural history and underlying facts; and write with less concern over finished precision than the need to communicate results quickly.

This case was filed on April 27, 1988, and was accompanied, at its filing, by a request by the Debtor that we immediately approve a Financing Order permitting it to borrow the sum of $700,000.00 from FHS, pursuant to 11 U.S.C. § 364(c), thereby giving FHS not only an administrative claim, but a super-priority lien on all previously unencumbered assets of the Debtor. The loan was said to be necessary to meet the Debtor's payroll on the following day. Originally believing the payday to be Friday, April 29, 1988, we scheduled a hearing at 9:00 A.M. on that date, only to learn that the Debtor and FHS had already advised numerous creditors that we would hear the motion that afternoon. Since several counsel already had convened, we ultimately did hear the matter that afternoon. After a spirited hearing, in which several unsecured creditors expressed dissatisfaction with the lack of notice of the Debtor's plan to close the hospital as quickly as possible, perhaps within thirty (30) days, we granted the motion on a temporary basis with important caveats: we reserved the right to reconsider the order and incorporated therein the waiver of 11 U.S.C. § 364(e) by FHS. This, as we expressed at the April 27, 1988, hearing, would allow us to ultimately rule on the motion after a fuller hearing and determine whether the criteria set forth in § 364(c) were indeed met before granting FHS the rights which the Financing Order proposed to give them. The full, final hearing was scheduled on May 4, 1988.

The developments of April 27, 1988, constituted a normative bankruptcy emergency. The events of April 29, 1988, placed this case into an unusual pattern causing us to weigh public interests and governmental powers, reminiscent of the issues put before us in *In re Metro Transportation, Inc.*, 64 B.R. 968 (Bankr.E.D.Pa.1986). In that case, we utilized 11 U.S.C. § 105(a) to enjoin the refusal of the state Public Utility Commission to approve the Debtor's plan to self-insure its taxicabs, thus preserving about half of the City's taxicab fleet from extinction. On this occasion, four doctors associated with the hospital filed a motion seeking to enjoin the Debtor from effecting an "operational plan" to close the hospital, particularly the closure of its emergency room (hereinafter referred to as "ER") planned at 11:00 P.M. that evening, and seeking the appointment of a trustee who would reconsider the Debtor's intransigent intention to close the hospital. Also five community groups, five individuals, three City of Philadelphia councilmen, and a state representative, later joined by the City itself, filed an Adversary proceeding seeking to enjoin the hospital closing. The United States Trustee also filed a motion seeking the appointment of a trustee.

After hearing from all counsel on the afternoon of Friday, April 29, 1988, we entered an Order at 5:30 P.M., enjoining the Debtor from further implementation of its "operational plan" pending a hearing on all of these matters on May 4, 1988, also. The Debtor appealed our order to the district court, but this was resolved by a stipulation effected on Saturday, April 30, 1988, providing that the Debtor would admit patients to the ER "to render essential life-saving measures," but would refer patients admitted into the ER to other hospitals if hospital admission was necessary and if "such transfer will not jeopardize the patient's health."

We conducted the May 4, 1988, hearing in a larger courtroom than our ordinary environs, which was nevertheless filled to capacity. The Debtor's principal witness was Scott Phillips, Senior Vice–President–Finance of FHS, who narrated a very attractive and impressive slide presentation indicating the extreme financial difficulties of the Debtor which, beginning in fall, 1987, had placed it into a pattern leading to projected losses of over $5 million annually. While the presentation was very comprehensive, it left us with the clear sense that FHS was in full control of the fate of the Debtor and had made its decision to close not due to the failure of the Debtor to meet the health needs of minorities and poor which the Debtor services, but because this mission was too great of a financial burden to FHS.

The doctors and the plaintiffs in the Adversary case made a rushed (we were restricted to seven hours to hear this matter and Mr. Phillips' testimony consumed almost half of this time) but poignant presentation, calling fourteen (14) witnesses. The important points made were the following: (1) The hospital is loved and heavily relied upon by the very low income community in which it is situated, being greatly preferred to neighboring facilities; (2) The City may be quite willing to invest considerable sums into the Debtor's preservation, although it would do so only if assured that the Debtor's management would be committed to preserving the hospital (and thus if a trustee were appointed); (3) Potential buyers

may exist for the hospital as a going concern, although none were identified by name; (4) FHS had opted for a course of quick, irreversible closure of the hospital without providing any notice to anyone, nor making any attempt to tap community or governmental resources to keep it open; and (5) The FHS loan would carry the Debtor through its next payday on May 12, 1988, and possibly the following payday on May 26, 1988, but no longer.

At the close of the hearing, we announced our intention to appoint an examiner the next day, after a period of submission of candidates and comments thereon from all interested parties. We scheduled a hearing on May 13, 1988, to receive a report from the examiner. We requested all interested parties to submit materials to us in any form in support of their positions on the outstanding motions by 4:30 P.M. on May 6, 1988. We also continued our order of April 29, 1988, as amended by the district court stipulation, in place at least until May 9, 1988, when we indicated that we would issue a further order.

On May 5, 1988, the United States Trustee appointed George L. Miller, an accountant whose skills are well-known to this court, as examiner. Mr. Miller was not proposed by any party; most of the proposed candidates appeared to have conflicts, which Mr. Miller did not.

One last development intervened. On May 6, 1988, we entertained a conference call from counsel for the doctors and counsel for the Debtor which raised a dispute about interpretation of our Order of April 29, 1988. The Debtor interpreted our Order as allowing it to cease elective admissions to all hospital departments except obstetrics, because other departments had ceased taking elective admissions prior to the entry of our Order, while the doctors apparently read it as requiring the Debtor to halt all efforts to cease admissions in any hospital department. The doctors also contended that FHS had instituted a program to encourage employees to resign by paying them a bonus to do so. We directed the doctors to file a motion which we agreed to hear on May 9, 1988. After

presentations by counsel on May 9, 1988, we announced our intention to file this Opinion and an Order clarifying our Order of April 29, 1988, in order to express some preliminary decisions and thereby give the parties guidance as to how we believe matters must proceed hereafter.

There are two issues which demand our immediate attention, i.e., the request of the doctors and the plaintiffs in the adversary proceeding for preliminary relief to halt the closure of the hospital, and the status of the financing order. Having appointed an examiner, we cannot appoint a trustee at this time. 11 U.S.C. § 1104(b). An examiner cannot be later appointed as a trustee 11 U.S.C. § 321(b). We shall therefore defer any decision as to appointment of a trustee until we receive Mr. Miller's report, but we shall set forth herein some of the considerations which we shall make in determining whether to appoint a trustee.

The proponents of preliminary relief enjoining the hospital closure rely on a number of bases. The doctors argue that allowing closure to occur constitutes approval of a *de facto* plan of reorganization without meeting the procedural requirements of 11 U.S.C. §§ 1121–29. The plaintiffs in the Adversary action invoke several federal and state laws and City ordinances and regulations which they argue that the closure violates, including the following: (1) Title VI of the Civil Rights Act of 1964, as the closing will purportedly have a disparate impact on minorities; (2) The Hill–Burton Act, 42 U.S.C. § 291a, et seq., as it will leave the community without free services which were to be compensatory for the Debtor's past use of Hill–Burton funds; (3) 28 PA.CODE § 101.196, which reads as follows:

A hospital shall give written notice of an intent to close to the Department, not later than 90 days prior to the anticipated date of closing.

(4) A City Health Department Regulation, which provides as follows:

2. *Continuation of Emergency Care and Facilities*

No hospital in the City of Philadelphia which has provided emergency care ...

shall discontinue such care or facilities, in whole or in part, unless and until it shall be authorized so to do in writing by the Health Commissioner of the City of Philadelphia or his designee.

(5) A provision of the Women's and Infant Care (hereinafter referred to as "WIC") program contract between the Debtor and the City, requiring thirty (30) days notice of termination; and (6) A City ordinance requiring a business which seeks to close to provide notice to the City Director of Commerce. PHILA.CODE §§ 9–1501, 9–1502.

We believe that the invocation of at least the fourth and fifth of the two above-referenced arguments have merit. We also believe that viable prospects for keeping the Debtor open have not been fully explored and must be explored while the Debtor remains a going concern in order to serve the public interest of keeping the Debtor open if possible. We shall therefore extend and clarify our April 29, 1988, injunction.

■ A threshold consideration is by what authority we act in requiring a debtor to remain in business when it wishes not to do so. This is a rather unusual problem for a bankruptcy court to consider. Typically, a debtor files for bankruptcy with the hope of remaining in business even though its creditors contend that the prospects have vanished. *Compare In re Gulph Woods Corp.,* 84 B.R. 961 (Bankr.E.D.Pa. 1988); and *In re Cann & Saul Steel Co.,* 76 B.R. 479 (Bankr.E.D.Pa.1987). As a general principle, a debtor clearly has a right to proceed to terminate its business as it wishes, and to utilize Chapter 11 as a basis for filing a liquidating plan.

In most cases, however, there is little prospect of dissent from such action. The creditor body rarely, if ever, believes that a business should be continued if its ownership concludes otherwise. Rarely do other forces in the community have sufficient concern about a debtor's enterprise to attempt to insist that it be continued.

■ However, we believe that actions of a debtor are subject to certain limitations.

These are set forth in 28 U.S.C. § 959, which provides as follows:

§ 959. Trustees and receivers suable; management; State law.

(a) Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury.

(b) A trustee, receiver or manager appointed in any case pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the reqirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possession thereof would be bound to do if in possession itself.

We believe that it is inescapable to avoid the conclusion that 28 U.S.C. § 959(b) requires a debtor to conform with applicable federal, state, and local law in conducting its business. Further, 28 U.S.C. § 959(a) gives parties aggrieved by a debtor's actions in violation of such laws the right to enforce that law in any other court, free from the impact of the automatic stay. *See Haberern v. Lehigh & N.E. Ry.*, 554 F.2d 581, 585 (3d Cir.1977).

Of course, the fact that 28 U.S.C. § 959(a) allows aggrieved parties to go elsewhere to enforce their rights does not means that the bankruptcy court cannot enforce these rights also. The impact of 28 U.S.C. § 959 upon bankruptcy proceedings is well exemplified by the decision in *In re Quanta Resources Corp.*, 739 F.2d 912, 919–21 (3d Cir.1984), *aff'd sub nom. Midlantic National Bank v. New Jersey Dep't of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986). There, the Court of Appeals relied upon 28 U.S.C. § 959(b) as an alternative grounds

for refusing a trustee's motion to abandon a facility containing hazardous waste materials, in violation of state law. The court did so even though the case was a Chapter 7 case, and the trustee argued, not without force, that 28 U.S.C. § 959(b) was in applicable because the trustee desired to liquidate as opposed to operate and manage the business. *See* 739 F.2d at 926 (Gibbons, J., dis. op.). *But see* 106 S.Ct. at 761–62 (Court relies upon considerations of § 959(b) for support despite holding that it is not technically applicable to Chapter 7 liquidations).

FSH and the Official Creditors' Committee (hereinafter "the Committee") attempt to distinguish this case from *Quanta Resources* by arguing that the magnitude of the state policy in cleaning up environmental hazards is qualitatively more significant than maintaining this hospital in an area where some alternative care facilities exist. However, the task of deciding which laws are so significant that they cannot be violated is not ours to choose. The statutory provision requires that *all* laws must be followed by the debtor in possession.

Furthermore, the record contains ample evidence that the alternative care facilities are qualitatively inferior to those of the Debtor. Moreover, the entire field of health care is one which has caused bankruptcy courts to take otherwise most unusual acts in the public interest, as in *In re An Unknown Group of Cases Seeking to be Filed*, 79 B.R. 651 (Bankr.E.D.Va.1987), where the court *sua sponte* refused to accept for filing a group of Chapter 7 petitions emanating from health care companies, on the ground that these filings would endanger continued health care to certain nursing homes and hospital emergency rooms.

We therefore have no hesitancy in concluding that, in effecting its plan to close its facility, the Debtor must comply with all applicable federal, state, and local laws.

However, we question whether there has been any violations of either Title VI of the Civil Rights Act or the Hill–Burton Act which would justify our intervention. There is no question that there will

be a disparate impact upon minorities as opposed to whites if the Debtor closes its facility, and Hill–Burton obligations, of which the community is the beneficiary, will obviously go unmet. However, we perceive nothing in either federal Act which would require a facility within the scope of these Regulations to remain open to insure that patients' rights under these Acts are preserved. As we have learned from the ultimately unsuccessful attempt of community forces to prevent the relocation of the Wilmington Medical Center from a needy, low-income community and into the suburbs, *see N.A.A.C.P. v. Medical Center, Inc.*, 657 F.2d 1322 (3d Cir.1981), there are distinct limitations upon the managerial decisions of hospitals which courts can effect. As the Debtor points out, the Hill–Burton Act contemplates rather than prohibits the closing of hospitals imposed with obligations of that Act. See 42 U.S.C. § 291i; and 42 C.F.R. § 124.704. Therefore, we fail to see how these laws provide a cause of action to the adversary plaintiffs.

Further, there is the difficult issue of the plaintiffs' standing to raise these issues, even if we concluded that these laws created rights relevant here. *See, e.g., Cort v. Ash*, 422 U.S. 66, 77–85, 95 S.Ct. 2080, 2087–91, 45 L.Ed.2d 26 (1975); and *New Jersey Speech–Language–Hearing Ass'n v. Prudential Insurance Co.*, 724 F.2d 383 (3d Cir.1983). While we believe that standing requirements should be relaxed in bankruptcy proceedings, due to the fact that bankruptcy jurisdiction encourages participation of all interested parties on issues relevant to the debtor, *see In re United Church of the Ministers of God*, 74 B.R. 271, 276 (Bankr.E.D.Pa.1987); and *In re Morrison*, 69 B.R. 586, 588–90 (Bankr.E.D.Pa.1987), we must observe that the adversary plaintiffs, unlike the doctors, are not creditors or agents of the Debtor, and may have difficulty meeting the definition of interested parties. Therefore, we are not prepared to act on the basis of these proposed violations of the law.

We also believe that the City ordinance requiring notice of the closing of a business is clearly inapplicable. There are two obviously pertinent exclusions: (1) Businesses filing bankruptcy. PHILA.CODE, § 9–1501(1); and (2) Non-profit corporations. *Id.*, § 90–1501(2). The Debtor fits within both of these excluded categories.

However, the alleged violation of the state regulation which appears to require a 90–day notice to the Commonwealth Department of Health prior to the closing of a hospital; the City Health Department regulation requiring a written authorization from the City Health Commissioner before an emergency care facility can be closed; and the 30–day notice required by the City's WIC contract with the Debtor cannot be so easily dismissed and all appear pertinent. The only compliance with any of these notice requirements alleged by the Debtor was a letter to the Commonwealth Department of Health dispatched on April 28, 1988.

The purpose of these notice requirements seems clear. They are calculated to require that the state and City receive at least some notice of the intentions of a hospital to close in order that these governmental bodies can study the need for the services which are proposed to be discontinued and determine whether governmental intervention is necessary. Such intervention could conceivably take the form of financial assistance, negotiation with the facility to continue services under certain circumstances, or court action by the governmental body to prevent the action.

The principal response of the Debtor to the applicability of the state regulation was the presentation of an Affidavit of Assistant Counsel of the Department of Health indicating that the 90–day requirement of the Regulation is not mandatory and expressing a general lack of concern about the Debtor's planned action. We note that the state agency, although specifically provided notice of these proceedings, has not participated in them. The Debtor also points to the opaque nature of the Regulation, suggesting that it can notify now and begin to proceed with closing immediately. Although patient services were targeted for cessation on May 15, 1988, and the complete closing targeted for June 30, 1988, the Debtor contends that, in light of

the non-mandatory nature of the 90–day limitation, no violation of the regulation has been proven. Emphasized is the holding in *Butler County Memorial Hosp. v. Heckler*, 780 F.2d 352, 355–57 (3d Cir.1985), that the Department of Health's own liberal interpretation of this regulation is entitled to great weight. The standing of the adversary plaintiffs to interpret it otherwise is questioned. Finally, it cites to *Preston v. City of Philadelphia*, 26 Pa. Cmwth. 106, 116–17, 362 A.2d 452, 457 (1976), wherein the court refused to enjoin the closing of the Philadelphia General Hospital because the City purportedly violated state laws requiring prior approval of alterations in institutions receiving aid from the state.

All of these arguments have some force. We think that the State regulation most logically should be read as requiring that the 90–day notice precede the commencement of any actions directed towards closure. However, we are reluctant to interpret this regulation strictly in light of the State's indications that it is not meant to be so interpreted.

■ However, we note that most of the arguments as to why the State regulation should not bar the Debtor's actions of closure can be turned directly against the Debtor when we consider the City regulation and contractual provisions regarding the Debtor's closing of its ER and discontinuance of its WIC program, respectively. First, the City's response to the Debtor's proposed closing has been a most vigorous opposition to its doing so. The City has joined in the adversary proceeding to prevent the closure as an intervening plaintiff. No colorable compliance with the City regulation or contractual provision has been alleged. The fact that the *Preston* case was decided on the merits supports the principle that community groups, doctors, and patients have standing to challenge a hospital closing. The merits of that case involved interpretation of a distinct state statute and hence are of no real pertinence here. In any event, the City clearly has standing to enforce its own regulations and contracts. The application of the principles

of the *Butler* case require us to defer to the City's interpretation of its own Health Department's regulation as applicable to institutions which plan to close. Frankly, the fact that the provision of the City Code under which the regulation was promulgated, PHILA.CODE § 6–402(4), applies to ongoing institutions would not logically appear to exempt institutions which are presently ongoing but are planning to close in the future, as the Debtor suggests. Therefore, we conclude that the Health Department regulation requires the Debtor to maintain the ER until authorized to do otherwise by the Health Commissioner of the City and to comply with the WIC contract until after the period of the 30–day notice expires.

In light of this holding, any efforts of the Debtor to curtail the ER service in any respect which have occurred thus far may have been illegal and should, technically, be affirmatively reversed. However, we also recognize that the City regulation and contract only impact upon the ER and the WIC program. Given our doubt that the state regulation did not also prohibit any curtailment of other services until 90 days after the dispatch of the notice has passed, we believe that the most conservative relief which we can provide is to prevent any further restrictions on admissions through the ER and the obstetrics department of the hospital, the latter of which continued to accept elective admissions through 5:30 P.M. on April 29, 1988. We shall not, however, require the Debtor to make elective admissions through its other departments. We also are concerned that a plan of FHS to provide monetary bonuses to employees who resign may effectively create a personnel crisis in the hospital. Therefore, through at least the next fifteen (15) days, we shall curtail that program, and allow the bonuses to be paid only if the employee has met the pre-notice resignation requirements or fifteen (15) workdays pass after a request is made for such a bonus, whichever is longer.

We are reinforced in the propriety of this action by the evidence adduced at the May 4, 1988, hearing, and the colloquy with counsel on May 9, 1988. We believe that a

real possibility exists that the City or some other governmental body may be ready, willing, and able to provide financial assistance to the Debtor. We also believe that a sale of the Debtor as a going concern is a possibility. Given these prospects and the intense public interests served by the effectuation of a plan of reorganization which would have such features, as opposed to the prospect of immediate liquidation, we are inclined to agree with the doctors that we cannot permit these potentials to be destroyed by actions taken by the Debtor at such an early stage in these proceedings. We believe that the Order will minimally assure that the Debtor will remain a going concern for a least the next fifteen (15) days.

■ However, the practical effect of our order may be very severely limited by the simple fact that the Debtor lacks cash and may find it impossible to maintain itself after a certain point in time. As a counterpoint to our extension of the injunction on further actions of the Debtor to close the facility, we decline to enter an order which encourages any further deterioration of the position of the unsecured creditors. They, like the community, were taken completely by surprise by the Debtor's announcements of impending closure, which appears to have been, and not to their credit, the intention of the Debtor and its controlling entity, FHS. We are herein proceeding to deny the Debtor's motion to approve its financing agreement with FHS in connection with the loan of $700,000.00. We do not view this action as providing FHS to recover funds obviously advanced, due to the automatic stay, although we do recognize that this result will possibly discourage FHS from making any further cash infusions to the Debtor. It may put the doctors and the adversary plaintiffs to the test of supplying cash or seeing the Debtor close because of lack of cash to do otherwise.

In *In re Crouse Group, Inc.,* 71 B.R. 544, 549 (Bankr.E.D.Pa.1987), we held that, in order for us to approve financing under 11 U.S.C. § 364(c)

the Debtors must ... sustain the burden of establishing the following ...: (1) They are unable to obtain unsecured credit per 11 u.S.C. § 364(b), i.e., by allowing a lender only an administrative claim per 11 U.S.C. § 503(b)(1)(A); (2) The credit transaction is necessary to preserve the assets of the estate; and (3) The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

Here, we believe that the second criterion has been satisfied, the satisfaction of the first criterion is questionable, and that the third criterion has definitely not been satisfied. The most significant factor in our analysis is our perception that FHS completely dominates the Debtor and that the particular crisis requiring the infusion of $700,000.00 was manufactured by FHS. It was apparent, in the attractive slide presentation by Mr. Phillips, that he spoke of conclusions reached by FHS, for its own purposes, apart from any real interests of the Debtor as an independent entity. The immediate cash-flow crisis was created, in part, by FHS's decision not to inform the community or the governmental bodies which might have assisted the Debtor had it known of its plans. Having conceived this scenario itself, for its own particular economic benefit, FHS should not be permitted to foist off any unavoidable negative economic consequences upon other parties. We consider the bankruptcy filing, at a time when the Debtor's cash resources were depleted due to circumstances within the control of FHS and just before a payday, to be the archetype of a "tailored emergency." *See In re Ellingsen MacLean Oil Co.,* 65 B.R. 358, 364–65 (W.D. Mich.1986); and *Crouse, supra,* 71 B.R. at 550.

Regarding the first criterion, we acknowledge that the Debtor consulted an ample number of private financial institutions for assistance when it was teetering on the edge of complete lack of cash, and that none of them would assist it. However, we question whether inquiry of financial institutions at the eleventh hour was a practical method of obtaining financial assistance for this Debtor. Clearly, this

Debtor had the resource of a record of community support in light of its having supplied human needs in exemplary fashion which would have rendered requests from governmental bodies, at some time prior to this crisis-point, a very reasonable alternative for obtaining not only credit, but possibly outright grants of financial assistance. This was apparently not done, not because of unawareness of this resource, but because it was believed, by FHS, that secrecy and then immediate action would be more economically destructive to the Debtor and effective in serving its ends.

These conclusions cause us to refuse to find the terms "fair, reasonable, and adequate" under the circumstances. We believe that we can and should look beyond the Debtor's immediate financial circumstances to determine who is responsible for creating those circumstances. Here, we are compelled to conclude that the immediate crisis was largely created by FHS, which is not an outside lender but the puppeteer of a marionette-debtor.

Our decision in *Crouse* resulted largely from our belief that the proposed lender, Federal Insurance Company (hereinafter "Federal"), was acting principally in its own interests in funding the Debtor and that it would fund the Debtor there without the incentive of § 364(c). 71 B.R. at 551. In retrospect, we were entirely correct, because Federal did proceed to fund the Debtor anyway. There was, however, at least a certain degree of distance between Federal and the Debtor there which precluded our finding that Federal *created* the problem which caused the Debtor to be in need of immediate cash.

Here, on the other hand, there is little doubt that FHS, the lender itself, carefully orchestrated the circumstances which caused the Debtor to need to borrow the sums necessary to make payroll. We refuse to reward FHS for its actions by granting it any priorities under § 364(c).

We believe that the second *Crouse* criterion was in fact met, and that the $700,-00.00 was needed by the Debtor as of April 28, 1988, to make payroll. However, we view the issue of preservation of the Debt-

or's assets differently than FHS. FHS viewed it as a stop-gap on the road to the Debtor's rapid liquidation. We view it as a minimal compliance with moral obligations created by FHS's own actions, and as a necessity to allow the Debtor to continue to exist.

In our Order of April 27, 1988, approving the $700,000.00 loan, we expressly stated that we might reconsider any aspect of that Order after the hearing on May 4, 1988. FHS, cognizant of this provision, nevertheless, chose to make the loan. We do not think, under the circumstances, we have treated FHS unfairly in any way. Had we known as much of FHS's role in creating the Debtor's circumstances as we know now, we may well have hesitated to enter any order at the time. Under these circumstances, it is not fair to give FHA a priority over the Debtor's innocent unsecured creditors. We therefore conclude that the Financing Order will not be approved.

We also wish to emphasize that our decision is prompted largely by our preception of FHS as the creator of the need for the loan, as serving its end to provide just enough funds to permit the hospital to close. If FHS changed its focus to an attempt to preserve the Debtor, at least for the brief period until we can determine whether effects to save it were futile, the result which we reached may well have been different, and might be different if we are presented with such a request in the future.

We recognize that this Order places pressure on not only the Debtor, but on the doctors and the adversary plaintiffs, to come up with funds from probably some source other than FHS, or the Debtor will shortly be doomed to complete financial collapse. This is, in a sense, a test by fire. If the doctors and the adversary plaintiffs do indeed have a prospect of coming up with funds or a buyer, they must produce such a party immediately. If they cannot, there would be little or no prospect of saving the Debtor in any event.

■ The doctors and the adversary plaintiffs may contend that it is necessary to replace the Debtor's management with a

trustee immediately, or funding sources other than FHS will be unwilling to lend to it. We are, however, unwilling to do this for several reasons. First, we believe that any such drastic action should be preceded by a report from our appointed examiner. Secondly, we believe that the interests of all concerned are best served by preserving the present administration of the Debtor unless and until they become destructive of the direction which we mandate must be taken. The ideal which we seek is that both the Debtor's management and FHS, throwing aside the adversarial atmosphere which has surrounded this matter, shall make a good faith effort, for at least a fifteen (15)–day period of time, to work with the doctors and the adversary plaintiffs to see if they can, with their concentrated efforts, save the Debtor from closure. We have every hope that the Debtor will make this attempt now that we have made our position clear. It may be that the doctors and the adversary plaintiffs, perceiving the impossibility of the struggle after that period, will agree that the Debtor cannot be saved. Hopefully, the Debtor will display the most difficult and hence most admirable of human traits and cause itself to reconsider its judgment that any prospects but closure of the hospital are feasible and make a good faith effort to avoid closure for this period.

On the other hand, we cannot allow the Debtor's management to stay in charge if this effort is not made. We will therefore be compelled to appoint a trustee, on the ground that management is acting contrary to court directives, if any of the following occurs:

1. The letter and/or spirit of our orders are not fully complied with.

2. The Debtor violates the City regulation and contractual provision.

3. The Debtor fails to cooperate totally with the examiner.

4. The Debtor contnues to refuse to work with any of the interested parties in exploring alternatives to its plan of closure.

Our decision in *Metro Transportation* was motivated, at least in part, by our perception of the adverse effect of the result of elimination of half of the city's taxicab fleet upon our community. 64 B.R. at 973–74. It might be argued that the alternative health care resources in our community exceed the alternative taxicab resources. However, the record there contained no evidence of these consequences and hence we were compelled to take judicial notice of them. Here, the affected parties were thrust before our eyes on May 4, 1988.

### ORDER

AND NOW, this 9th day of May, 1988, at 3:00 P.M., upon Motion of the Debtor for Leave to Borrow Monies and to Grant Security Interest (hereinafter referred to as "The Debtor's Motion"), the Motions of Theodore Lundy, M.D., et al. (1) for Appointment of a trustee and for a Temporary Order Against Implementation of an Unapproved Plan of Reorganization, and (2) for Amendment of a Prior Court Order and for Contempt (hereinafter referred to as "the Doctors' Motions") in the main case; and upon Motion of the Plaintiffs in the Adversary Proceeding for a Preliminary Injunction, it is hereby ORDERED and DECREED as follows:

1. The Debtor's Motion is DENIED.

2. The Doctors' Motion and the Plaintiffs' Motion are GRANTED in part.

3. The Debtor is enjoined, until further order of this Court, from taking any actions which further implement its "Operational Plan" promulgated on April 28, 1988, as set forth in paragraphs 4, 5 and 6 *infra* and in any other specific actions not addressed herein.

4. The Debtor shall continue to operate its emergency room at the same level of service at which it maintained the said emergency room, including admitting patients to the hospital therefrom on its normal operating basis as of 5:30 P.M. on April 29, 1988, pending further order of this Court.

5. The Debtor shall also continue to operate its Obstetrics Department and continue to make elective admissions through this department, but not necessarily accept

elective admissions in its other departments, on its normal operating basis as of 5:30 P.M. on April 29, 1988, pending further order of this Court.

6. The Debtor and/or Franciscan Health Services, Inc., shall cease to offer or pay or cause to be paid any bonus or gift to any employee upon termination on any terms or for any reason, other than a payment already required under the terms of an employment or other contract for work in effect as of April 27, 1988, unless the employee has given to the Debtor pretermination notice of at least fifteen (15) days, or pursuant to any time of notice for termination set forth in the Debtor's personnel policies, whichever is longer, pending further order of this Court.

7. The Debtor shall cooperate with the examiner, and cooperate with all other interested parties in exploring alternatives to closure of the Debtor-hospital over at least the next fifteen (15) days.

8. On or before 1:00 P.M. on May 24, 1988, the Debtor shall prepare, file, and serve upon all interested parties and the Court in chambers, a written report of its efforts in exploration of alternatives to closure in this 15–day period.

9. A hearing to determine the status of this matter shall be scheduled on

WEDNESDAY, MAY 25, 1988, at 1:00 P.M. and shall be held in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.