In re ST. MARY HOSPITAL, Debtor.

Niscasio VELEZ, Megan Hoerauf, Pedro Rodriquez, Maria Saez, Felix Saez–Crux, on behalf of themselves and all others similarly situated, Norris Square Civic Assoc., Philadelphia Welfare Rights Organization, New Kensington Neighborhood Advisory Committee, Fishtown Civic Association, Kensington Joint–Action Council, Angel L. Ortiz, James J. Tayoun, David Cohen, Members of Philadelphia City Council, Thomas M. Foglietta, Member of United States Congress, House of Representatives, and Vincent J. Fumo, Member of Pennsylvania Senate, Plaintiffs,

v.

ST. MARY HOSPITAL, Ronald R. Aldrich, and Franciscan Health System, Defendants.

Bankruptcy No. 88–11421S.
Adv. No. 88–0565S.

United States Bankruptcy Court,
E.D. Pennsylvania.

March 3, 1989.

See also, Bkrtcy., 89 B.R. 503.

Henry J. Sommer, Community Legal Services, Inc., Stephen F. Gold, Philadelphia, Pa., for plaintiffs.

Henry F. Siedzikowski, Philadelphia, Pa., for debtor.

David H. Marion, Philadelphia, Pa., for defendants/FHS and Aldrich.

Daniel E. Farmer, Philadelphia, Pa., for Doctors.

Virginia Powel, Asst. U.S. Atty., Philadelphia, Pa., for HHS.

Gary M. Schildhorn, Philadelphia, Pa., for Creditors' Committee.

James J. O'Connell, Philadelphia, Pa., Asst. U.S. Trustee.

David F. Fishbone, Philadelphia, Pa., for trustee.

Roger B. Hiser, East Greenville, Pa., trustee.

Seymour Kurland, City Sol., City of Philadelphia, Philadelphia, Pa., for the City.

W. Jeffrey Garson, Philadelphia, Pa., for Neumann Health Services, Inc.

OPINION

'DAVID A. SCHOLL, Bankruptcy Judge.

On January 24, 1989, counsel for the Plaintiffs in the above-captioned adversary proceeding filed a motion seeking substantial attorneys' fees for their services performed in the course of the instant Chapter 11 bankruptcy case.[1] This motion is based, alternatively, on 42 U.S.C. § 1988 and 11 U.S.C. §§ 503(b)(3)(D) and (b)(4). We hold that the narrow scope of §§ 503(b)(3)(D) and (b)(4) precludes the very broad interpretation of the term "creditor," submitted by the Plaintiff, such as would be necessary to allow the motion under that Code section. We also find that the Civil Rights Act claims raised by the Plaintiffs were without merit; consequently they played no role whatsoever in the ultimate disposition of this case; and that the claim based upon 42 U.S.C. § 1988 must be rejected as well.

The bankruptcy case underlying this proceeding was filed by the Debtor, the operator of a hospital, on April 27, 1988. The setting which gave rise to the filing of the adversary complaint on April 29, 1988, is recited in our Opinion of May 9, 1988, filed when this case was less than two weeks old and reported at 86 B.R. 393 (Bankr.E.D.Pa. 1988). The adversary complaint was filed simultaneously with the filing of a motion by four doctors working out of the Debtor's hospital (hereinafter referred to as "the Doctors") seeking to enjoin the Debtor from effectively promulgating a plan to close the hospital within 30 days (and, specifically, closing its emergency room that night), and seeking the appointment of a Chapter 11 Trustee. The Plaintiffs' claims were last set forth in the Second Amended Complaint in the adversary proceeding, apparently filed on May 5, 1988.[2] The Second Amended Complaint purports to maintain the proceeding as a class action on behalf of "all low income persons residing in or

working in the geographical area served by St. Mary Hospital who have been or will be adversely affected by the closing of St. Mary Hospital Emergency Room." Named as defendants are the Debtor, Franciscan Health Systems (hereinafter "FHS"), the parent of the Debtor; and Ronald R. Aldrich, the President of FHS (hereinafter "Aldrich").

The Second Amended Complaint recites four claims or causes of action, based upon the following respective theories: (1) Title VI of the Civil Rights Act of 1964, contending that the closing of the hospital will have a disparate impact on minorities; (2) The Hill–Burton Act, 42 U.S.C. § 291a, et seq., based on the loss of provision of free care otherwise available to the community through the hospital due its closure; (3) A state Regulation preventing hospital closings without notice to the state Department of Health, which was not provided; and (4) A City health regulation requiring written authorization prior to closure of a hospital emergency room, which also was not provided. It is apparent that only the first two claims are based on violations of the Civil Rights Act. The relief sought in the Second Amended Complaint is, essentially, prevention of the closure of the hospital's emergency room and requiring restoration of full services by the hospital to all class members. In addition to the Doctors, the Plaintiffs were joined in their efforts to halt the closure of the hospital by the City of Philadelphia, which filed its own adversary complaint to this end, and the United States Trustee (hereinafter "UST"), who joined the Doctors in pressing for the appointment of a Chapter 11 Trustee.

Our Opinion of May 9, 1988, came several days after our appointment of George L. Miller as an Examiner on May 5, 1988, in partial response to the request of the Doctors and the UST for appointment of a Trustee. See In re Florida Peach Corp. of America, International, 63 B.R. 833, 841 (Bankr.M.D.Fla.1986); In re John Peterson

---

1. The public-official plaintiffs were represented by Stephen F. Gold, Esquire, who seeks $6,975.00. The other plaintiffs were represented by Community Legal Services, Inc., which requests a total sum of $61,405.15.

2. This pleading is dated May 5, 1988, and appears in the adversary file, but is not noted on the docket.

*Motors, Inc.,* 47 B.R. 551, 553 (Bankr.D. Minn.1985); and *In re Landscaping Services, Inc.,* 39 B.R. 588, 590–91 (Bankr.E.D. N.C.1984) (court may appoint examiner *sua sponte* in response to a motion for appointment of a trustee). In that Opinion, we granted certain relief to the Doctors and the Plaintiffs, most notably enjoining the Debtor from taking any further action to close the hospital or discontinue emergency-room services. However, as we stated in that Opinion, the relief granted was solely on the basis of our findings of violation of the City regulation cited in the Plaintiffs' (and the City's) Complaint; violation of a provision of a contract between the Debtor and the City concerning operation of a Women's and Infants Care program in the hospital, an issue raised only by the City; and our belief that the Doctors' motion had merit in that it averred that alternatives to the closure of the hospital had not been fully explored. 86 B.R. at 397.

Our ultimate disposition of the two Civil Rights claims, 86 B.R. at 398–99, was as follows:

we question whether there has [sic] been any violations of either Title VI of the Civil Rights Act or the Hill–Burton Act which would justify our intervention. There is no question that there will be a disparate impact upon minorities as opposed to whites if the Debtor closes its facility, and Hill–Burton obligations, of which the community is the beneficiary, will obviously go unmet. However, we perceive nothing in either federal Act which would require a facility within the scope of these Regulations to remain open to insure that patients' rights under these Acts are preserved. As we have learned from the ultimately unsuccessful attempt of community forces to prevent the relocation of the Wilmington Medical Center from a needy, low-income community and into the suburbs, *see N.A.A.C.P. v. Medical Center, Inc.,* 657 F.2d 1322 (3d Cir.1981), there are distinct limitations upon the managerial decisions of hospitals which courts can effect. As the Debtor points out, the Hill–Burton Act contemplates rather than prohibits the closing of hospitals imposed with obligations of that Act. *See* 42 U.S.C. § 291i; and 42 C.F.R. § 124.704. Therefore, we fail to see how these laws provide a cause of actio to the adversary plaintiffs.

We further stated that "the adversary plaintiffs, unlike the doctors, are not creditors or agents of the Debtor, and may have difficulty meeting the definition of interested parties." *Id.* at 399. Thus, we concluded that "we are not prepared to act on the basis of these proposed violations of the law," *i.e.,* the Civil Rights Act claims. *Id.* Rather, we indicated that, while the Plaintiffs were very active and effective in presenting evidence at the hearing of May 4, 1988, which resulted in the Opinion and Order of May 9, 1988, it was the clear standing and claims of the City and Doctors which directly supported our actions. *Id.* at 399–401.

The May 9, 1988, Opinion was appealed, but not by the Plaintiffs. It was, perhaps, a crucial turning-point in the case, as it halted the efforts of the Debtor to close the hospital. However, the ultimate direction of the case was not established until we received the report of the Examiner on May 13, 1988, and not by reason of any of the claims asserted in the adversary proceeding. The Examiner's recommendation for same led directly to our immediate indication of an intention to appoint a Trustee, which came to fruition in the appointment of Roger B. Hiser as Trustee on May 17, 1988. The Trustee definitively put the Debtor down the path of keeping its hospital open and expanding services, and ultimately allowed the sale of the hospital as a going concern to an entity dedicated to trying to keep it open, Neumann Medical Center, Inc.

With the relief ultimately sought by the Plaintiffs effectively provided, the adversary complaint itself remained in limbo. A motion to dismiss it on the ground that it was moot as filed by all of the Defendants on September 8, 1988. The disposition of this motion and any further action in this proceeding (except the instant motion) has been continued until April 5, 1989, the date of the hearing on Confirmation of the Debt-

or's Plan. Confirmation of this Plan, apparently supported by all interested parties, will almost certainly render the merits of this proceeding moot.

■ One basis of the Plaintiffs' motion is 11 U.S.C. §§ 503(b)(3)(D) and (b)(4), which provide as follows:

Allowance of administrative expenses.

.     .     .     .     .

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

.     .     .     .     .

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—

.     .     .     .     .

(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title; ...

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant; ...

As we previously noted in *In re Beck–Rumbaugh Associates, Inc.*, 68 B.R. 882, 885–86 (Bankr.E.D.Pa.1987), *aff'd*, 84 B.R. 369 (E.D.Pa.1988), requests for compensation on the basis of these Code provisions which do not fit strictly within its confines must be denied. *Accord, e.g., In re Monroe Well Service, Inc.*, Bankr. No. 86–02012G, slip op. at 6–7, (Bankr.E.D.Pa. May

11, 1988); and *In re Paolino*, 71 B.R. 576, 579–80 (Bankr.E.D.Pa.1987). We believe that the Plaintiffs are incapable of clearing the initial threshold of establishing that they are within the scope of entities covered by §§ 503(b)(3)(D) and (b)(4) *i.e.*, that they are "a creditor, an indenture trustee, an equity security holder, or a committee ... other than a committee appointed under section 1102 of this title, ..."

The only possible category into which the Plaintiffs fall is that of "creditor." However, unlike the Doctors,[3] none of the named Plaintiffs contended that they were owed any sums by the Debtor at the time of filing. Recognizing this rather apparent deficiency, the Plaintiffs raise several ingenious, but ultimately unconvincing, arguments to attempt to overcome it.

First, although admittedly none of the named Plaintiffs are identifiable as creditors, they claim that they represent a class of, essentially, all low-income persons in the service area of the Debtor's hospital, and that surely *some* member of the class, although they are unable to identify precisely who, must have been owed a sum by the Debtor at the time of filing.

One difficulty with this argument is that the Plaintiffs have not specifically identified any unnamed class member as a creditor. It is improper for us to speculate or "take judicial notice" that some such party "must" be a creditor of the Debtor. The burden of proving creditor-status, beyond any speculation over same, is squarely upon the Plaintiffs.

Secondly, the status of this proceeding has never been certified as a class action. While it could be argued that the proceeding should nevertheless be treated as a class suit until certification takes place, the status of the unnamed class members as parties to this proceeding is at best in the pre-certification status of "a twilight zone" at present. *See In re Fleet*, 76 B.R. 1001,

---

**3.** Probably for tactical reasons, the Doctors have not applied for compensation and reimbursement under §§ 503(b)(3)(D) and (b)(4), and apparently do not intend to do so. We note that, since they may have in fact been creditors and

their efforts to stay the closing of the hospital and to appoint a Trustee were truly catalytic, they may well have been successful in pressing a motion under these Code sections.

1007 (Bankr.E.D.Pa.1987), quoting *In re Fine Paper Litigation State of Washington*, 632 F.2d 1081, 1086 (3d Cir.1980). In *Fleet*, we declined to extend a default judgment entered in favor of the plaintiffs to unnamed members of an uncertified class. 76 B.R. at 1005–08. Similarly, here, we are unwilling to classify unnamed members of the instant uncertified class as "Plaintiff-Creditors."

Finally, due undoubtedly to the fact that this adversary proceeding is itself no longer actively being litigated, but survives only as a failsafe if the confirmation process breaks down and as a vehicle for this motion, the Plaintiffs have never even moved to certify this proceeding as a class action. Pursuant to Local Rule 7023.1(c), a motion for such certification must be made within ninety days of the filing of the complaint unless an extension is granted. *Compare Fleet, supra,* 76 B.R. at 1005–07 (preceded adoption of Local Rule 7023.1; court considered reasons for the plaintiffs' delay and prejudice to opposing party therefrom in determining whether the request for class-action status had been effectively waived by laches). Although the instant proceeding was commenced prior to the adoption of the Local Rule and is arguably not subject to it despite the enactment of the Rule within the 90–day period after its filing, we note that, unlike the *Fleet* plaintiffs, the Plaintiffs here have proffered no explanation for their delay in moving for certification. We therefore do not believe that the unnamed class members can be considered to be parties to this proceeding. Thus, we do not believe that the class-action status of this proceeding is helpful to the named Plaintiffs in trying to salvage their lack of creditor status.

Secondly, the Plaintiffs argue that their very presence in this lawsuit, in which they are advancing "claims" against the Debtor, renders them "creditors," pursuant to the broad definitions of same in 11 U.S.C. §§ 101(4) and (9). This unabashed "bootstrapping" argument is not logically pleasing: if accepted, any person could establish creditor status simply by suing the debtor, even though no cause of action having any merit whatsoever was presented. Assum-

ing that we would ever accept such an argument, the flaws to it, as applied to the instant Plaintiffs, are as follows: (1) The "claims" of the Plaintiffs arose because of the Debtor's manifested intention to close the hospital, which occurred only *after* its bankruptcy filing. Therefore, the "claims" in issue arose post-petition and did not exist "as of the date of the filing of the petition," as required by 11 U.S.C. § 502(b). *See In re M. Frenville Co.,* 744 F.2d 332, 337 (3d Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985); and (2) Those portions of our Opinion of May 9, 1988, quoted at page 201 *supra,* determined that these very claims lacked merit.

The Creditors' Committee, the most vocal of the opponents of the Plaintiffs' claim under §§ 503(b)(3)(D) and (b)(4), also argues that the Plaintiffs failed to meet their burden of proving that their actions *did* make "a substantial contribution" to the case. It is true that the Plaintiffs have a rather heavy burden to fulfill in establishing that their efforts to keep the hospital open were of direct benefit to the estate. *See Monroe Well, supra,* slip op. at 7–10 (only very small portion of request found to have benefitted estate); *Paolino, supra,* 71 B.R. at 580–82 (only a portion of services performed were found to have benefitted the estate); and *In re Calumet Realty Co.,* 34 B.R. 922, 926–27 (Bankr.E.D.Pa. 1983) (no benefit to estate found to have resulted from services). Whether this burden was met, despite the very substantial *human* benefit effected by the retention of the hospital as a service-provider, is subject to question. The committee may be correct in suggesting that, when the dust is settled, it would have been served the estate's *financial* interest to have simply closed the hospital according to the expressed intentions of the Debtor and FHA.

Less convincing is the Committee's contention that, since the Plaintiffs' counsel was uncompensated, no claim pursuant to 11 U.S.C. §§ 503(b)(3)(D) and (b)(4) can be advanced. The theory of this Code section is to encourage *any* interested parties to make contributions to bankruptcy cases.

There would appear to be no logic in interpreting this section in such a way as to preclude low-income creditors, who are unable to advance fees an costs to their counsel and are represented only by legal-services programs or counsel agreeing to be compensated by only what they are ultimately able to obtain pursuant to 11 U.S.C. §§ 503(b)(3)(D) and (b)(4), from ever invoking these Code provisions. *Cf. Blum v. Stenson,* 465 U.S. 886, 892–96, 104 S.Ct. 1541, 1545–48, 79 L.Ed.2d 891 (1984); and *Rodriguez v. Taylor,* 569 F.2d 1231, 1244–46 (3d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978) (the right of plaintiffs' counsel to statutory attorneys' fees is not obviated or reduced adversely by the fact that the Plaintiffs were not obliged to compensate their counsel themselves). .

However, despite this observation, since we hold that the Plaintiffs here are not creditors, we shall not allow them to invoke 11 U.S.C. §§ 503(b)(3)(D) and (b)(4) here.

■ The second basis of the Plaintiffs' motion is 42 U.S.C. § 1988, which provides, in pertinent part, as follows:

> In any action or proceeding to enforce a provision of sections 1981, 1983, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1984, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

The Plaintiffs' contend that they prevailed in this proceeding, at least in substantial part, because their aim of retaining the Debtor's hospital as a service-provider to them has been achieved. While they acknowledge that the court did not award them any relief, particularly on the basis of their Civil Rights Act claims, on which we expressly stated that we were "not prepared to act," they claim that the presence of these claims was catalytic, and that they are entitled to fees under 42 U.S.C. § 1988

on the basis of the reasoning in *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983); *Maher v. Gagne,* 448 U.S. 122, 129, 100 S.Ct. 2570, 2574–75, 65 L.Ed.2d 653 (1980); *Disabled in Action of PA. v. Pierce,* 789 F.2d 1016 (3d Cir.1986); *Institutionalized Juveniles v. Secretary of Public Welfare,* 758 F.2d 897, 911–17 (3d Cir.1985); and *NAACP v. Wilmington Medical Center, Inc.,* 689 F.2d 1161, 1165–70 (3d Cir.1982), *cert. denied,* 460 U.S. 1052, 103 S.Ct. 1499, 75 L.Ed.2d 930 (1983).[4]

FTS and Aldrich, joined by the committee and the Trustee, argue that the Supreme Court's decision in *Smith v. Robinson,* 468 U.S. 992, 1015, 104 S.Ct. 3457, 3470, 82 L.Ed.2d 746 (1984), dooms the Plaintiffs' claims under § 1988. There, the Supreme Court held that, since the plaintiffs ultimately succeeded only in their claims based upon a cause of action under a statute which does not authorize fee-shifting, unaddressed claims based upon § 1988 cannot serve as a basis for counsel fees. *Accord, Buero v. Trierweiler,* 616 F.Supp. 1414, 1415–17 (E.D.Mich.1985). Here, of course, we *did* address the Plaintiffs' § 1988 claims in an Opinion filed just a few days after the Plaintiffs' Second Amended Complaint in this proceeding was filed, from which the Plaintiffs have not appealed, and therein expressly refused to grant relief on these causes of action.

At oral argument on February 23, 1989, the Plaintiffs expressed lack of familiarity with *Smith, supra,* and we permitted them until the end of the following day to file a Supplemental Brief (the third submitted by the Plaintiffs in support of this motion) addressing, *inter alia,* the pertinence of the *Smith* decision. Therein, the Plaintiffs argue that *Smith* is distinguishable from the instant proceeding because (1) There, unlike here, the case in which fees were sought was litigated to judgment, thereby

---

**4.** We note that distinction of this claim under 42 U.S.C. § 1988 from a request under that same statute for attorneys' fees based on the theory that a violation of the Bankruptcy Code constitutes a violation of 42 U.S.C. § 1983. *See, e.g., Higgins v. Philadelphia Gas Works,* 54 B.R. 928,

933–34 (E.D.Pa.1985); and *In re Watts,* 76 B.R. 390, 408–09 (Bankr.E.D.Pa.1987), *aff'd,* 93 B.R. 350 (E.D.Pa.1988). No state action is present here, and thus no claim under 42 U.S.C. § 1983 could be mounted by the Plaintiffs.

eliminating any speculation as to the significance of the plaintiffs' Civil Rights Act claims in achieving the result favorable to the plaintiffs. Here, as the matter was not finally adjudicated, it is argued that the Plaintiffs' claims may have been proven, if final adjudication had taken place, to have had substantial impact on the outcome. In any event, they were a significant catalyst to the result achieved; and (2) Here, the claims on which the Plaintiffs did prevail were not on legal theories and certainly not on facts distinctly different from their Civil Rights Act claims. *Compare Smith,* 468 U.S. at 1006–07, 1015, 104 S.Ct. at 3465–66, 3470 (ultimate claims on the merits, which were distinct from earlier, procedural due process claims on which the plaintiffs' attorneys had received compensation, were not related to the earlier due process causes of action, on which successful § 1988 claims could have been asserted).

In certain contexts, the Plaintiffs' contentions might be acceptable. It is true that there was no final decision on the merits of the adversary complaint. It is also true that the presence of the adversary complaint was largely responsible for the absence of any objection to allowing the Plaintiffs to participate in the subsequent hearings in this case, even after the Examiner's report and the appointment of the Trustee resulted in providing the Plaintiffs with the relief which they sought by means totally independent from any of the issues discussed in the May 9, 1988, Opinion. It is also true that the Plaintiffs' participation in this case on many issues was vigorous and effective; valuable to the court in considering the difficult issues involved in this case; and well served the public interest. Therefore, despite their questionable standing to raise the issues which they did in the adversarial proceeding as creditors or any other category which would traditionally be classified as "interested parties," the Plaintiffs' participation in the case as a whole was totally proper. The broad scope of a bankruptcy proceeding should always result in allowing full participation by parties who are, in good faith, advancing the public interest. *See* 86 B.R. at 394–95 ("The most significant feature of bankruptcy jurisdiction is that it extends to all or most issues relevant to a debtor and that it contemplates participation by any party having an interest in any issues relating to the debtor.").

However, all of the foregoing does not affect the very practical observation that, on May 9, 1988, we also stated, as definitively as could be stated in an Opinion addressing only requests for provisional relief, that we believed that the Plaintiffs' Civil Rights Act claims had no merit. Therefore, it is safe and accurate to assume that these claims had no bearing on our subsequent decisions in this case. The "catalyst" theory assumes, at bottom, that a plaintiff's Civil Rights Acts claims had *some* impact on the final result achieved by the party advancing same. Here, we can unqualifiedly state that these claims had *no* impact on our decisions on May 9, 1988, or thereafter, which led to what the Plaintiffs believe was a result favorable to their interests.

The facts that a final result was reached in the *Smith* case and not here should not be relevant. Mere invocation of Civil Rights claims, no matter how baseless, in a suit which ultimately is resolved favorably to the plaintiff short of a final court decision should not automatically trigger attorneys' fees under § 1988. Rather, a court faced with a § 1988 motion in this context must consider, at least to some degree, the merits of the Civil Rights claims and their impact on the result. The Court of Appeals, without expressly articulating that it was doing so in these terms, was in fact proceeding in this fashion in *Tunstall v. Office of Judicial Support,* 820 F.2d 631 (3d Cir.1987). There, a request for attorneys' fees under § 1988 was denied, irrespective of the benefits achieved by the plaintiff to his interests in the litigation, because the court deemed the Civil Rights action baseless.[5]

5. There, moreover, the Civil Rights Act claims may well have *had* a substantial impact on the benefits achieved by the plaintiff, which they did not here. Even the District Court there, in declining to award fees, 638 F.Supp. 833, 835–37 (E.D.Pa.1986), did not do so on the basis that

**206**

Here, similar to the reasoning process of the Court of Appeals in *Tunstall*, we found and continue to find the Civil Rights Act claims were (and are) baseless. We also find that the results perceived to be beneficial to the Plaintiffs which were achieved in the course of administration of this case were primarily due to the motions for the appointment of the Trustee, as those motions led to appointment of the Examiner and, ultimately, a Trustee who was dedicated to achieving the result of keeping the hospital open. In so stating, we are not overlooking that the Plaintiffs vigorously and effectively supported the motions to appoint the Trustee. However, the strength of the Plaintiffs' motion under § 1988 is dependent solely on the strength of their Civil Rights Act claims. Here, the Civil Rights Act claims were not even among those found, in the May 9, 1988, Opinion, to be supportive of the "holding action" imposed by the Orders resulting from that Opinion which ultimately set the stage for the Trustee to accomplish the ends that he did.

We therefore conclude that the reasoning of the *Smith* case is persuasively against the Plaintiffs' motion. The fact that no final decision was rendered here in the adversary proceeding, largely because it became unnecessary to do so, is irrelevant. The Plaintiffs prevailed, if the result is so perceived, because of happenings completely apart from their Civil Rights Act claims. Moreover, we can veritably now say, looking back on this case, that the Plaintiffs' Civil Right Act claims were not at all significant in the course that the case took, and certainly were not a "catalyst" to the results achieved, as was at least arguably true in the Civil Rights Act cases cited at page 204 *supra* upon which the Plaintiffs rely.

Consequently, we will enter an Order denying the Plaintiffs' motion insofar as it is based on 42 U.S.C. § 1988, as well as under 11 U.S.C. §§ 503(b)(3)(D) and (b)(4).

the Civil Rights Act claims definitively lacked